MILLIE HAWTHORNE, Appellee, v. FREDERIC A. DELANO et al.,
Appellants.

**APPEAL AND ERROR:** Effect of General Reversal. A general or-
1  der of reversal, on the ground of insufficiency of evidence to
sustain the verdict, sends the cause back to the trial court for
full retrial. If no materially different evidence is produced on
such retrial, a directed verdict should be entered against plain-
tiff.

**EVIDENCE:** Privileged Communications—Report of Accident. The
2  report of an' accident, made by a railroad company to the rail-
way commission,. under Section 2120-k, Code Supp., 1913, is not
privileged.

*Appeal from Shenandoah Superior Court.*—GEORGE H. CAS-
TLE, Judge.

APRIL 4, 1918.

ACTION to recover damages for mutilating a dead body.
Judgment for the plaintiff in the court below. Defendant
appeals.—*Reversed.*

*J. L. Minnis, N. S. Brown,* and *Jennings & Mattox,* for
appellants.

*Earl R. Ferguson* and *C. R. Barnes,* for appellee.

GAYNOR, J.—The plaintiff brings this action in two
counts, one bottomed on a common-law liability, and the
other bottomed on a claimed violation of Section 4945 of
the Code of 1897, which reads:

"If any person, without lawful authority, wilfully dig
up, disinter, remove or carry away any human body, or the
remains thereof, from its place of interment; or aid, assist,
encourage, incite or procure the same to be done or at-
tempted; or wilfully receive, conceal or dispose of any such
human body or the remains thereof; or if any person, with

the intent to commit any of the aforesaid acts, partially perform the same; or if any person wilfully and unnecessarily, and in an improper manner, indecently expose, throw away or abandon any human body, or the remains thereof, in any public place, or in any river, stream, pond or other place, he shall be imprisoned in the penitentiary not more than two years, or be fined not exceeding twenty-five hundred dollars, or both."

The contention of the plaintiff is that, some time on the night of August 11, 1913, one Charles Hawthorne was killed by being pushed or kicked from one of defendant's trains, known as No. 14, and the body left lying upon the track; that, while it was so lying, the company wrongfully mutilated it, thereby causing plaintiff, as the mother of the dead boy, to suffer great mental pain and anguish. The father assigned to this mother, plaintiff, an alleged cause of action existing in his favor, based upon the same facts. The body was discovered in the morning of the 12th, greatly mangled, and lying between the rails of the track.

Damages for the wrongful death of the decedent were settled in another action, and are not involved in this action. The only claim here rests upon the alleged wrongful act of the defendant in mutilating the body after death, resulting in great mental pain and suffering to the father and mother.

This particular case was in this court before on appeal. The opinion of the court is found in 172 Iowa 44. On the former trial, this court found that the evidence in the record was insufficient to justify a verdict for the plaintiff, and that a motion interposed by the defendant for a directed verdict should have been sustained. The case was accordingly reversed and remanded. Upon its return to the district court, the defendant filed a motion for judgment in its favor, based upon the fact that this court, on the

1. APPEAL AND ERROR: effect of general reversal.

former appeal, judicially determined that the evidence was insufficient to justify a verdict against it, and that the court to which it was remanded should, therefore, enter judgment in its favor. This motion was overruled, and this is the first complaint made.

It will be noted that, on the first appeal, this court determined that, upon the record there made, the evidence was insufficient to justify a verdict for the plaintiff. It did not determine that the plaintiff did not have a cause of action against the defendant, if the facts relied upon were proven. It reversed it simply because the evidence submitted on that trial did not justify a verdict against the defendant, and remanded it for retrial. It was then up to the plaintiff to introduce further evidence to support her contention. If no further evidence were offered upon the second trial than appeared upon the first trial, then the finding of this court upon that evidence would be conclusive upon plaintiff's right to recover. But upon the retrial,—a retrial having been permitted by reversal,—plaintiff might offer further evidence supporting her contention, and a case might be made against the defendant sufficient at least to go to the jury.

Of course, on an appeal to this court in a law action, a finding by this court that the record does not disclose sufficient evidence to justify a verdict against the defendant, is not a finding that sufficient evidence does not exist to justify a finding against the defendant. So, upon reversal, unless otherwise ordered, it was up to the plaintiff to make a further showing in support of her contention, and to this end she introduced further evidence upon the issues tendered. This court, however, may, upon an examination of the whole record submitted to it on appeal, determine that all the evidence which either party can offer legitimately is before the court, and that it is insufficient to justify a verdict against the defendant; and it may, thereupon, by special

order, direct the court to enter a judgment in the defend-
ant's favor.   Or if, on appeal, it is found that, conceding
all that plaintiff contends for as established, plaintiff has no
cause of action, the court may, by proper order, dispose of
the case on appeal, and so direct the lower court.   A simple
reversal and remand of the case to the district court does
not necessarily determine either of these questions, and
does not necessarily end the case.   The plaintiff may, if
he has other testimony supporting his claim, have a re-
trial and introduce further testimony and take the judg-
ment of the court upon the case as then made.   However,
we have had occasion recently to pass upon this question,
and our finding is against the contention of plaintiff on this
point.   See *Owens v. Norwood-White Coal Co.,* 181 Iowa
948.

Upon the overruling of the motion for a directed verdict
based upon the finding of this court upon the former appeal,
the case proceeded to a retrial in the district court.   At the
conclusion of all the evidence, the defendant moved again
for a directed verdict, based upon the insufficiency of the
evidence to justify a verdict against it.   This motion was
overruled.   The theory on which this motion was overruled
is that the record as made upon this second trial was not
the same as the record made upon the former trial; that
further evidence bearing upon issuable facts was submitted
by the plaintiff; and that this was sufficient to justify a sub-
mission of the cause to the jury.   A verdict was returned for
the plaintiff.   The overruling of this motion is the second
ground of complaint on the part of the defendant.

This requires an examination of the record as now be-
fore us.   We will say, however, that the record is substan-
tially the same as made on the former appeal, with the ex-
ception of two or three matters, to which attention will be
hereafter called.   The opinion on the former appeal recites
fairly the facts as they then existed in the record, and at-

tention is called to a recitation of facts there; and we will not attempt to repeat them here, but confine ourselves to a consideration of this added testimony which, it is claimed, distinguishes this record from the record on the former appeal.

On the former appeal, Earl Polk, upon whom the plaintiff relies specially to prove one of the material facts in this controversy, testified:

"I never saw him going to the cornfield; I saw him in the cornfield. The porter followed him along and then got on the train. Deceased ran parallel, inside the cornfield, going the same way as the train. At the cut, he slid down the bank, and caught the back end of the sleeper. He had hold of the train, and someone in blue uniform pushed him off. I was watching. He fell. I was looking out of the window near the middle of the chair car. The weather was warm. My window was up. I was leaning out as far as I dare without falling off. I never saw him since they pushed him off and he fell. He fell from the rear steps of the sleeping car. The train was going reasonably slow up a big grade. When they pushed him off, he lit about the middle of the rails. They pushed him off, and that was the last I saw of him."

He adds to his testimony in this trial that he saw him lying in the middle of the track, after he fell or was pushed off.

This really is the only substantive testimony that the deceased was killed by being pushed or kicked off the train, and his dead body left lying upon the track. There is no evidence that any officer in charge of the train knew that he was dead and that his dead body was left lying upon the track. The most that can be said from this evidence is that, after he fell from the train, he was seen lying upon the track. There is no evidence that anybody knew or had reason to believe at that time that the fall had killed him.

The train went on its way. There was no evidence that any-
one on the train knew then that he was injured. The train
was picking up speed rapidly. It passed into a cut. We
say the evidence does not show that he was then dead, or
that anyone in charge of the train had reason to believe
that he was dead,—that the fall had killed him. To make
a case, it must appear that the defendant, before allowing
its trains to pass, knew that a dead body was lying there
upon the track. The knowledge of these train officers, even
if the evidence could be construed to reach this point, that
the decedent had been pushed off or kicked off or had fallen
from the train, and was lying upon the track immediately
after his fall, did not charge the company with notice,
through these officers, that the decedent was dead and lying
on the track at the time the later trains were permitted to
pass that way over the body, if they did so do. The ques
tion is not now whether the company was legally respon-
sible for the death, even though caused by other trains. The
cause of action for alleged mutilation could arise only
after the death of the decedent, and because of the muti-
lation of the dead body. The argument for the plaintiff is
that the circumstances shown were sufficient to warrant
the jury in finding that decedent was killed in falling from
train No. 14, and that the trainmen must have known it.
Train No. 14, of course, did not mutilate the body. The de-
ceased fell behind this train, and this train moved on its
journey. The mutilation, if any, must have been caused
by trains following over the same track later. It is not
claimed that any of the employees of any of these following
trains knew that the body was upon the track at any time.
It is the claim of the plaintiff that the train crew, or some
of them, knew that the body was upon the track, and that
this knowledge should be imputed to the defendant com-
pany, regardless of any want of knowledge on the part of
the employees who ran trains over the body. The theory

upon which plaintiff plants her case is that the decedent was killed by the train from which he was removed; that the employees in charge of that train knew that he was killed in falling from that train; that, with this knowledge, which is sought to be imputed to the company, it left him lying upon the track, and thereafter permitted trains to pass over the place where the dead body was lying, and mutilate it.

As we have said before, there is not sufficient evidence to justify the jury in saying that any member of this crew on No. 14, the train from which he fell, knew that he was killed in the falling, or knew that his dead body was left lying upon the track. There being no knowledge in this crew, there was no knowledge to impute to the company that would call for action on its part. We may assume that the knowledge of this crew, if it had knowledge that the dead body was lying on the track, would be imputed to the company and would be the knowledge of the company; and if, with this knowledge, as imputed, it wrongfully permitted its trains to pass over the track while the dead body was there exposed, and mutilated it, the company might be liable; but knowledge must be shown in these employees before any can be imputed to the company.

On this trial, however, the plaintiff introduced a paper on which she relies to show that the company did have knowledge that the dead body was lying upon the track. This paper came from the files of the railroad commissioners, and purports to be, and we may assume is, a certified copy of a notice given by the defendant company to the railroad commissioners, in pursuance of the requirements of Section 2120-k of the Code Supplement of 1913, which reads as follows:

2. EVIDENCE: privileged communications: report of accident.

"That upon the occurrence of any serious accident upon any railway within this state, which shall result in

personal injury, or loss of life, the corporation operating the road upon which the accident occurred shall give immediate notice thereof to the board of railroad commissioners whose duty it shall be, if they deem it necessary, to investigate the same, and properly report to the governor the extent of the personal injuries, or loss of life, and whether the same was the result of mismanagement or neglect of the corporation on whose line the injury or loss of life occurred. Provided that such report shall not be evidence or referred to in any case in any court."

In obedience to this requirement of the statute, it appears that the defendant company made to the board what is called a report of this accident, on a blank furnished by the board, in which it said:

"Report of accident at or near Strahm, Iowa, on Moberly Division of above-named road [defendant's road], on August 12, 1913. Time, eight P. M. Killed, one, Charles Hawthorne, a trespasser. Was stealing a ride on passenger train 14, engine 347, and fell off train and fatally injured.

"[Signed] General Superintendent."

Assuming, but without deciding, that this report was competent evidence, we have to say that it fails to show the fact to establish which it was offered: to wit, that the company knew, prior to August 12, 1913, that the dead body of Charles Hawthorne was lying upon the track at the time of or before the passage of the trains that followed No. 14, which, it is claimed, mutilated the body. There is no date to this report, no showing when it was filed with the board of railroad commissioners, no showing when the information came to the company upon which the report was predicated, or by whom it was communicated to the company. If it be true, as contended for by the plaintiff, that Charles Hawthorne died immediately upon falling from the train, and was left lying upon the track, his death must have occurred about 8 o'clock in the evening of August 11th. The

first train passing after that was a westbound train, passing through Shenandoah about 9:09 P. M.; the next, a freight train, 1:40 A. M.; next, 4:09 A. M.; next, 7:32 A. M. The body was removed from the track about 7:00 o'clock on the morning of the 12th. The paper introduced in evidence indicates on its face that the party signing the paper understood that the accident occurred on the 12th. It is apparent, then, that the person signing the paper did not know that the accident occurred prior to the passage of the trains which it is claimed mutilated the body. Therefore, the paper itself does not show that the person signing the paper knew that the dead body of Charles Hawthorne was lying on the track prior to the passage of these trains which mutilated the body. Assuming that the knowledge of the sender of this notice was the knowledge of the company, the knowledge was of an occurrence on the 12th, and after the time when the body was removed, and could not be construed into a holding that the sender of this notice to the commissioners knew that the fatal injury occurred on the night of the 11th, so as to charge the defendant with notice before the passage of the trains which it is claimed mutilated the body.

So we hold that this notice, even conceding it to be admissible as evidence, does not furnish proof that the defendant knew, prior to the time these trains that followed No. 14 passed over the track and mutilated the body, that the dead body was lying upon the track and would be mutilated by the trains, if they were permitted to pass.

It is the contention of the defendant, however, that this paper was not admissible; that, the paper having been furnished to the railroad commissioners, under the compulsion of the section hereinbefore set out, it was, by the terms of the section, privileged information, and could not be used against the company furnishing it.

We cannot agree to this proposition. The report which

is privileged is the report made by the commissioners to the governor. The company, under the statute, is required simply to give notice to the commissioners of the fact of the accident, the time and place, and is not required to furnish any detailed statement as to how the accident occurred, or the circumstances or conditions under which it occurred. Ordinarily, there would be needed no protection against the use of the report made by the commissioners to the governor; since it would be, of necessity, an ex-parte investigation, made, not in the interest of future litigants, not in the interest of the injured party or his legal representatives, but in the interest of the general traveling public, and to aid in the better regulation and control of train service, in the interest of the state and the public. In an investigation of this kind, started under this statute by the railroad commission, however, it may have been the thought of the legislature that much of the information on which the report to the governor rested, must be secured through an examination of the agents and employees of the company, and would necessarily be embodied in the report to the governor; that, to secure a full, fair, and honest exposé of all the facts by the company to the commission, on an examination or investigation, the report made upon such examination could not be used in evidence or referred to in any case in court: this, that the company might be free in its communication with the state officers, to tell them the truth, the whole truth, and nothing but the truth; that the investigation in the interest of the public and the state might be full, free, and untrammeled, and without fear of consequences to the company or to those who aid in making the report, in the event litigation grows out of the transaction. This, we think, was the purpose of the statute, and this, we think, is a fair interpretation of the statute. The notice, however, which the company is required to give, does not involve an exposé of matters which involve the

cause of the accident or the circumstances under which it occurred. If the company voluntarily makes statements in this notice, beyond the requirements of the statute, such statements may not be protected even by any rule of public policy invoked by counsel for the defendant in this case. In the language of our former holding, we now hold that, regardless of the question of whether, upon any view of the evidence, the defendant might be held for the alleged wrongful killing of the decedent by means of some train, no special liability is disclosed as for the mutilation of the dead body, or as for a violation of Section 4945 of the Code.

Other questions are discussed, but we do not deem it necessary to pass upon them at this time, and the judgment of the district court is—*Reversed*.

PRESTON, C. J., LADD, SALINGER, and STEVENS, JJ., concur.