S. S. OLSON, Appellee, v. PERRY HODGES, Appellant.

No. 46716.

JULY 27, 1945.

Gill & Gill, of Sioux City, for appellant.

E. O. Bundy and Robert B. Pike, both of Sioux City, for appellee.

BLISS, J.— ■ Plaintiff in his petition prayed judgment against the defendant for $15,000. Defendant, in answer to the petition, admitted that plaintiff was injured while riding in defendant's automobile as the latter's guest but denied that any injuries received by plaintiff were caused by any recklessness in defendant's operation of the automobile. The answer also alleged assumption of the risk of riding in the automobile on said highway. Under the instructions of the court the maximum verdict recoverable by plaintiff was $12,587.95. The maximum recovery on each item of damage was $292.95 for hospital and medical expenditures, $880 for earnings lost, $5,000 for past pain and suffering, and $6,415 for disability and loss of earnings in the future. The legs of plaintiff were broken below the knees. The verdict of the jury and judgment thereon was for $1,200. Defendant's motions for a directed verdict and for judgment notwithstanding the verdict, based upon the ground that the evidence did not establish recklessness on the part of defendant, and upon the ground that plaintiff knew the road and weather conditions and assumed the risks incident to the operation of the automobile, were overruled.

Appellant's assignments of error were bottomed upon the rulings on these motions, and upon the fourteenth instruction.

I. Automobile guest cases, under section 5037.10, Code of 1939, have been before this court many times since its enactment in 1927. The provisions of the statute and the controlling principles of law as repeatedly stated by this court are well known. The difficulty lies in the application of those principles to the varying facts in each case. Because the cases differ in facts, there is no profit in the dissection of precedents.

The injury occurred on Sunday, March 5, 1944. About three o'clock in the afternoon plaintiff, fifty years old, and Mr. Salisbury, a friend of many years, went to the Union Club in downtown Sioux City. The defendant, whom the plaintiff had met a few times during the previous year, was there and

was introduced to Salisbury. They had a couple rounds of beer and a drink of liquor each from a half-pint bottle of Salisbury's. Upon learning that defendant was going to drive to Denison, Salisbury proposed to him that he take his juke box in the car to Denison, as he had no place to keep it. Defendant finally agreed to take it if it could be carried in his Tudor Chevrolet. The car was parked just outside the club and they drove about a block along the street to the place where the instrument was and loaded it into the car. The back of the right half of the front seat was leaned forward and the base of the juke box was placed against the floor and back seat and the rest of the instrument extended forward on the reclining back of the front seat. It occupied the entire right side of the car. Defendant drove the car and plaintiff sat just behind him in the rear seat and Salisbury was seated to his right and against the juke box. They were quite crowded in the back seat.

Snow began falling before noon and when they started the precipitation was about half snow and half rain. There was from an inch to several inches of slush on the streets. There were a few small spots of ice under the slush. These were the weather and road conditions throughout the afternoon, and were, of course, apparent to each of them, except that the spots of ice were not noticeable. Defendant drove the car from downtown out through East Morningside to the end of the streetcar line and entered State Highway 141, a paved road leading to Denison, about seventy-five miles to the southeast. It was shortly before four p. m. when they started. The injury occurred about five p. m., or a little before, about ten or twelve miles from the business section of Sioux City. Everything proceeded well as they drove through the city and beyond Morningside until within five or six miles of the place of injury. The highway is somewhat winding and proceeds through a slightly rolling country. There are a number of rather sharp curves in the road. The plaintiff and Salisbury testified for plaintiff respecting the trip. Plaintiff testified:

"So we got in the car and moved down on Fourth Street and went down till we hit 141; and when we went up there

everything was going along pretty good till we got to the main highway, and then is when he got to driving pretty fast and I was afraid, anyway, and I couldn't stand it any more, and I asked him to slow down, asked him if he wasn't driving too fast that way on this highway that was slushy; and he went on * * * and he didn't pay any attention; so I asked him again —I was getting a little scared; and a couple of times he drove up on the shoulder of the pavement, and when he came off it again the car began to sway; and I was getting pretty scared; so it went on for a while and he wouldn't slow down; and he said he didn't want to be all night going down to Denison and back; and he was traveling pretty fast and he got up on the shoulder, and it was then he got to swaying and it never did come off and we hit the bridge then. It was around 4:30. The street was awful slippery, slushy and winterish, there was no snow on the pavement, it was icy. I should say Hodges was going around thirty miles, as near as I could guess. * * * There are quite a few curves in this road after you get out a ways. It looked to me like the car was out of control as he couldn't get it under control after it started swaying after he got off the shoulder. * * * when it was swaying just before it went into the bridge, why it was out of control then, and the rear end of the car swung in and hit the left abutment of the bridge, and that was the side I was sitting on, and it bounded from that side over to the other side and hit the other side and it stopped there. I imagine that I called his attention to the way and manner in which he was driving not less than three times. He didn't heed my desire.''

The first time he told defendant to drive more slowly was about four or five miles out of Morningside and about the same distance from the place of the accident. The second time that he told the defendant he was scared and to not drive so fast was about a mile or two miles from the place of the injury. And, just before the accident:

''I just asked him if he wouldn't please slow down, that I was getting scared. * * * the pavement is too slippery for the speed you are going.''

Answering a question as to whether the car was out of control at any time before it struck the bridge, the plaintiff testified:

"Not clear out, but it swayed; and then he got up on the shoulder a few times, and he seemed to have a heck of a time getting it in control again, but he always did till—probably a hundred feet from the bridge, the car skidded or twisted around and struck the bridge and I would figure he was driving around thirty miles."

On cross-examination he testified:

"I don't think he was driving quite as fast as thirty miles the first few miles after we left Morningside but just as soon as we got away from the street car line out of Morningside he started driving that fast. I hadn't said anything to him in Morningside about driving too fast. * * * Q. Did it slip any place from Morningside down to just before you got to the place of the accident? A. Well, it never got off the pavement, but the back end of the car would skid once in a while. * * * It slipped several times before we got to the place of the accident. * * * The first place was four or five miles this side of the accident."

The record fairly shows that, when he testified that the car went up on the shoulder, he did not mean the dirt shoulder, but meant the curved cement shoulder constructed to carry the water off.

Salisbury testified:

"It was snowing and rain, or snow and rain together and it was awful wet. The paving on 141 was wet and slippery in places where the cars hadn't worn off the snow and slush as they went along. There was a little ice in spots. It was more like rain and snow together, big flakes that were awful wet. * * * I should judge—he was driving carefully here in town, but after we passed Morningside he stepped on it a little bit. I should judge, around thirty * * * maybe a little more. * * * Q. Did you observe his mode of driving or traveling down 141? A. The only thing I could see, it would be more of a skid

there. There was quite wet stuff, and when he was going fast when he would hit one of those wet spots or a little ice or something I guess Mr. Olson made a little remark there to him about not going so fast. * * * He didn't seem to pay any attention to him. He just kept right on going. * * * I think the car skidded three or four times before we hit that bridge there where it skidded into the bridge. * * * I told him to slow down a little bit * * * and Mr. Olson said, 'Slow down, I'm getting scared.' * * * Well, he didn't pay any attention to us whatsoever. It just seemed like he bowed his neck and just went ahead and drove. * * * The last time the car skidded, when it hit the bridge, it was about seventy or eighty feet, or something like that, from the bridge and had gotten up on the shoulder. It kind of skidded one way and he tried to get it back, but it hit the shoulder on the paving and then hit *this mud* and he tried to get it back and then it hit the bridge.''

On cross-examination, Salisbury testified:

''Well, some of it would melt and some wouldn't; as the cars drove along there it melted, because it was more of a rain and snow together; more rain and snow, slush and sleet. There wasn't much of anything that stayed on the pavement. The first time we slid was just after we left Morningside Avenue. * * * it was on a flat stretch and it skidded some. I imagine he was going about twenty-five miles an hour then * * * it buckled back and forth a couple of times and then he got control of it again. It didn't skid as much as half way across the pavement or go over the edge of the pavement. * * * Q. And it would be on its own side of the pavement? A. Yes. He had to get it back, because there was another car coming. Q. The car, as it was driving at that time on that trip, when it skidded and slid the first time and the second time and the third time, if it did, that you have mentioned, before the accident, it always remained on its own side of the paved road, did it? A. Outside of the time we had the wreck —well, there was once that it pretty near turned around in the middle of the road about that second skid there, but he got

control of it and got it back to the road. But when he hit this bridge there was no chance of getting it back on its own side of the road because he was clear on the wrong side of it. Q. When *he hit the mud*, that was this dirt—that was dirt which crossed it from another road, a dirt road; is that right? A. Yes. Q. You didn't know that mud was there till you got on it, did you? A. No, I didn't. Q. And he didn't know there was any mud there? A. No. * * * The pavement runs straight there for two or three miles before you get to the bridge. Before he hit the bridge he was not in the center of that paved portion of the road; he was on his own side of the road until the car started skidding and then he got over a little too far. * * * But at no time was it off the pavement. It wasn't off the pavement when it skidded. Q. The skidding was on the pavement when it crossed that mud that was carried on there by the wagons or automobiles from the mud road? A. Yes, sir. Q. There was no time when this car skidded or slipped that it got off the paved road? A. No. Q. In those one, two, three or four times? A. No, it didn't get off the road, only skidded. Q. I said, off the *paved* road. A. No, sir, it didn't, no, sir. Q. And you say that the speed was, one place, twenty-five miles an hour, that you mentioned? A. Yes, that was right after we left the city limits—was while we were still going onto Highway 141 there. I imagine that was about how fast he was going. I wouldn't swear whether he drove up thirty miles all of the time, when he came to curves he slowed down a little bit, and when he would get a good stretch he would go faster. He was driving twenty-five miles an hour when we got out of Morningside, and then when we got out of the city limits the rest of the way he was driving about thirty miles an hour and he slowed down where there were some curves or anything like that. * * * from where this mud was, where it hit, that, I would judge was about thirty feet across from there and came onto the bridge.''

The above-stated excerpts of testimony present a sufficiently complete statement of the record in the aspect most favorable to the plaintiff. Only the defendant testified in his behalf. His version of what took place is, briefly, as follows:

"After we left Morningside and entered on 141 it was still snowing and it was slippery. The snow at that time was melting about as fast as it fell; it made the pavement wet. There wasn't any ice as it was melting and there couldn't have been ice. We did not run into any spots of ice before we came to the place of the accident and there wasn't any spot of ice where the accident occurred. There was some snow, and the road was slushy with a thin layer of slush on the pavement. * * * For the last sixty rods to the bridge it was slightly downgrade. * * * there wasn't any ice in that sixty rods or where the accident occurred. There is no intersection where I hit the mud on the road at the time of the accident, it is a lane from the farmer's yard leading up to the pavement on the right-hand side of the pavement. It isn't a public highway, it is a lane, and the buildings on that lane I imagine are about twenty rods from the pavement. * * * the lane does not go across the pavement. * * * I did not know there was any mud on the pavement before I got to that spot or near it, where this road lane came in. I was traveling about twenty-five or thirty miles an hour on this trip and I was probably going about twenty-five miles an hour before I got to where this accident occurred. I was never on the wrong side of the paved highway nor did my car get over the center line on that trip. I was on my own side at all times. I struck this mud and the car skidded and slid sideways for a ways and started to go over the bank [of the creek] on the left-hand side of the road; and I managed to get it back in the center of the road again; then the rear of the car swung around and hit this bridge. * * * It didn't get off the pavement at all. I did all I could to stop the car or control it after it was sliding; I just tried to hold the car onto the pavement * * * to avoid going into this creek. I put the brake on after the car started to slide * * * but the car was sliding so the brakes wouldn't have anything to do with it * * * Mr. Olson didn't say a word to me about my driving on that trip and he never made any objection to the speed at which I was driving. He never made any objection at any time on that trip, and neither did Mr. Salisbury. They

never made any statement to me about the car slipping and before we got to the place where it did slide at any time on that trip. I have talked with both of them after this collision.''

As a part of plaintiff's cross-examination, defendant introduced a statement signed by plaintiff on March 14, 1944—nine days after the accident. In part, it is as follows:

''It is my understanding Hodges was going to Denison. My buddy, Clarence Salisbury, asked me to go along. He told me he would make it worth my while if I would go along to help lift a small piano out of the car. They made arrangements for the trip between themselves but in my presence.

''At any rate we started for Denison. Just before the accident occurred the car started to skid, the back end started to slide around, and before Hodges could get the car under control it had skidded into a bridge bannister.

''It was about five P. M. It was snowing a little. I had not noticed the pavement being slick. Hodges was a good, careful driver. He had not been driving fast or carelessly. He was only going twenty-seven or twenty-eight miles per hour when the accident happened. It happened right in front of some farm buildings and a drive into this place. There had been some dirt pulled out on the pavement, which caused the car to start skidding.

''We were all sober, we had only a couple of beers. Neither of us were intoxicated in any way. * * *

''Have you read this statement? Yes. Is it true? Yes.''

Appellee's explanation of the statements in this writing, which are contrary to his testimony, was that a stranger, who he supposed was an adjuster, interviewed him at the hospital, but he did not remember what he told him, and he did not read the statement which the man wrote, and it was not read to him, and he was in great pain and had been taking considerable opiates during that first month.

Accepting the testimony of appellee and Salisbury most favorable to appellee, and all favorable inferences deducible therefrom, as true, and disregarding all adverse statements of

appellee in his signed statement, and all portions of appellant's testimony which are unfavorable to appellee, it is, nevertheless, our firm conviction that all reasonable minds must agree that the record does not establish that there was "reckless operation" of the car within the intendment of the guest statute and this court's repeated definitions of the term.

There is no issue of intoxication in the case. The issue before us is whether the record, viewed as favorably for appellee as it is reasonably possible, sustains the submission to the jury of the issue of appellant's reckless operation of the car. Was there sufficient evidence to establish a prima facie case of "recklessness"? Welch v. Minkel, 215 Iowa 848, 853, 246 N. W. 775. The answer must be reached by consideration of the evidence, the statute, and our decisions construing it. The "guest statute" (section 5037.10, Code, 1939) was enacted for the specific purpose of relieving the driver of a motor vehicle from any liability for injuries received by his guest as the result of the driver's *negligence*. Redfern v. Redfern, 212 Iowa 454, 457, 236 N. W. 399; Siesseger v. Puth, 213 Iowa 164, 169, 170, 239 N. W. 46; Neessen v. Armstrong, 213 Iowa 378, 384, 239 N. W. 56; Wright v. What Cheer Clay Prod. Co., 221 Iowa 1292, 1293, 267 N. W. 92. Under that statute the driver is liable for injuries to the "person riding in said motor vehicle as a guest or by invitation and not for hire," only when they are caused by the intoxication of the driver or by his "reckless operation" of the vehicle. In the Siesseger case, supra, 213 Iowa 164, 182, 239 N. W. 46, 54, the court defined the term "reckless operation" of a motor vehicle, keeping in mind the purpose of the legislature in enacting the statute. In its subsequent decisions the court has not departed from that definition but rather it has fortified and emphasized it for the protection of the driver. Under our decisions reckless operation of a motor vehicle is not inadvertence, momentary thoughtlessness, error in judgment, careless conduct, or negligence. Neither is it a degree of negligence. Shenkle v. Mains, 216 Iowa 1324, 1328, 247 N. W. 635. "* * * even though negligence be great, it is still negligence." Levinson v. Hagerman, 214 Iowa 1296, 1300, 244 N. W. 307, 309;

Phillips v. Briggs, 215 Iowa 461, 464, 465, 245 N. W. 720. It is something more than negligence. "* * * recklessness means something entirely distinct from and beyond negligence." Brown v. Martin, 216 Iowa 1272, 1277, 248 N. W. 368, 370. It is negligence "plus other elements which raise it to the dignity of recklessness." Stanbery v. Johnson, 218 Iowa 160, 165, 254 N. W. 303, 306. In the contemplation of the statute "reckless" means "proceeding without heed of or concern for consequences"; it implies "no care, coupled with disregard for consequences." Siesseger v. Puth, supra, 213 Iowa 164, 182, 239 N. W. 46, 54, and numerous decisions citing that case. "To constitute recklessness under the guest statute, conduct must be more than negligent and must manifest a heedless disregard for or indifference to the consequences or the rights or safety of others." Harvey v. Clark, 232 Iowa 729, 732, 6 N. W. 2d 144, 145, 143 A. L. R. 1141. In Petersen v. Detwiller, 218 Iowa 418, 421, 255 N. W. 529, 530, the term *"utter* disregard to the consequences" is used. In Levinson v. Hagerman, supra, 214 Iowa 1296, 1299, 244 N. W. 307, and in Wion v. Hayes, 220 Iowa 156, 164, 261 N. W. 531, the language is *"utter* indifference to the safety of the guest." (Italics ours in each quotation.) In Wright v. What Cheer Clay Prod. Co., supra, 221 Iowa 1292, 1302, 267 N. W. 92, 97, the court said: "In order to be reckless * * * the driver must have had knowledge of the hazard or peril, *or in the exercise of reasonable and ordinary care * * * should have acquired such knowledge,* and appreciated that hazard and danger existed, but acted in *entire disregard* of the existing danger, and proceeded without heed of or concern for consequences without any care whatever * * *." (Italics ours.) •

As said in Shenkle v. Mains, supra, 216 Iowa 1324, 1328, 247 N. W. 635, 636:

"The statute calls imperatively upon us to recognize a substantial distinction between negligence and reckless operation. * * * Having laid down in the Siesseger case [213 Iowa 164, 239 N. W. 46] the line of demarcation to the best of our ability, our remaining duty for the future is to apply the rule

without vacillation to the concrete facts of the particular case. Such has been our course in the cases here above cited. The two grounds upon which recovery may be predicated under section 5026-b1 [section 5037.10, 1939 Code] are *exceptional* and not general. The *general* rule is that a guest cannot recover. The exceptional grounds are: (1) 'intoxication' of the driver, (2) 'reckless operation' by the driver. The exceptional character of these grounds implies an infrequency of application thereof. To use and apply the exceptions as the general rule, and in effect to supplant the general rule with the constant use of the exceptions, is to drive against a red light. If the application of the exceptions becomes more frequent than that of the general rule, it may well be deemed a warning sign that we are misapplying the exceptions.''

Applying the rule of these decisions to the facts in this case convinces us that the appellee failed to bring himself within the second exception of the statute. While testimony for appellee contains language which, standing by itself, and on its face alone, might seem to support his contention of reckless operation—''driving pretty fast,'' ''driving too fast,'' ''he wouldn't slow down,'' ''he didn't heed my desire,'' ''nor show any inclination, concern, desire or any intention to heed what I said,'' ''he bowed his neck,'' ''the car was out of control,'' ''he stepped on it''—these statements must be considered in the light of other facts shown by testimony introduced by the appellee. These facts are, in a distance of five or six miles the car slipped and swerved three or four times but until it reached the mud and silt, it never passed over the center line or off the pavement: it was only momentarily out of control and was soon brought into control; it was always on the right half of the pavement; the speed never exceeded thirty miles an hour; he drove from twenty-five to thirty miles an hour and ''slowed down where there were some curves or anything like that''; the approach to the bridge was straight and upgrade for almost all the way for the last two or three miles and slightly downgrade for the last sixty rods; there was no car approaching from ahead; the appellant had no knowledge of the mud and silt which had

been carried onto the pavement by traffic from the private driveway; it was concealed by the slush; it clearly appears from testimony for appellee that it was the slippery mud and silt which caused the car to strike the abutment of the bridge.

Certainly there was nothing in the appellant's operation of the car which indicated he was "proceeding without heed of or concern for consequences," "with no care," "with utter indifference to the safety of his guest, and entire disregard of existing and apparent danger." Driving at a speed of twenty-five miles an hour and slowing down for curves or other interference, and then going a little faster, maybe thirty miles per hour or a little more, on a "good stretch," is not operating a car in daylight on a country road with "no care," "utter indifference to safety," and "in heedless and entire disregard for consequences." It is about the way the ordinarily careful motorist would operate his car under like conditions.

Of course, weather and road conditions may make travel on the highways impossible, or too hazardous to attempt, but that was not the situation on this Sunday afternoon. Other motorists were on the highway. A very great many persons have operated or ridden in motor vehicles when snow, ice, slush, and mud made travel more difficult and hazardous than when the highways were dry. And they will continue to do so. Much of this travel is necessary or cannot be avoided. In such travel greater care and watchfulness and more expert operation of the mechanism of the car are required, but one driving under such conditions is not reckless in traveling, nor is he reckless if the car may slip or swerve or skid because he misjudges the condition of the road at some place, or he, by intention or inadvertence, applies the brakes too forcibly or abruptly or feeds the gas somewhat too freely. Such errors may be negligence but they do not constitute reckless operation. An important factor in determining whether there was reckless operation of a motor vehicle is the fact that the driver either knew and appreciated the existing dangers, or the conditions and circumstances were such or were so obvious that he should have known and been conscious of the dangers. Proof of either is

sufficient. It is the heedless disregard of these known or apparent dangers that constitutes recklessness. Appellant knew of the road conditions but it cannot be said, under the record, that he was utterly heedless of or indifferent to them. If the facts in this case are to be the pattern or measure of reckless operation of a motor vehicle when there is snow, slush, ice, or mud on the highways, then the guest statute will afford little protection to the motorist using such highways. It is our conclusion that all reasonable minds must agree that the appellant was not reckless in the operation of his car as alleged by appellee.

Decisions other than those already cited which sustain our conclusion are: Popham v. Case, 223 Iowa 52, 271 N. W. 226; Bowermaster v. Universal Producing Co., 221 Iowa 831, 834, 835, 226 N. W. 503; Petersen v. Detwiller, supra, 218 Iowa 418, 419, 255 N. W. 529 (in the three cases just cited, mud or silt on the highway was a factor in causing the accident); Wilson v. Oxborrow, 220 Iowa 1135, 1141, 1142, 264 N. W. 1; Koch v. Roehrig, 215 Iowa 43, 46, 244 N. W. 677; Paulson v. Hanson, 226 Iowa 858, 862, 863, 285 N. W. 189; Tomasek v. Lynch, 233 Iowa 662, 669–671, 10 N. W. 2d 3; Long v. Pearce, 233 Iowa 1025, 10 N. W. 2d 50; Roberts v. Koons, 230 Iowa 92, 97, 98, 296 N. W. 811; Mayer v. Sheetz, 223 Iowa 582, 584–588, 273 N. W. 138; Thuente v. Hart Motors, 234 Iowa 1294, 15 N. W. 2d 622. In the recent case of Russell v. Turner, D. C., Iowa, 56 F. Supp. 455, Judge Graven, of the Northern District of Iowa, reviewed the "guest cases" decided by this court, to ascertain whether under those decisions, the plaintiff guest had made a case of reckless operation against the driver and the owner of the car. The court directed a verdict for the defendants. The Circuit Court of Appeals, 8 Cir., Iowa, 148 F. 2d 562, 566 (April 19, 1945) affirmed, saying that the "trial court reached a permissible conclusion under the applicable Iowa law." Neither the driver nor the guests had much, if any, familiarity with the road on which the car was proceeding, or with the cross road forming the T intersection. The driver, sixteen years old, while driving on an unmarked, but good, graveled country road, the last mile before reaching the inter-

section being a good dirt road, reduced the speed of the car from seventy-five miles per hour to sixty-five miles per hour, at the request of the occupants, but with the remark that, "I don't care; I'm mad." The car failed to make the turn. The tire marks showed the brakes had been applied thirty-six feet before reaching the intersection.

The fact that the appellee and Salisbury protested to appellant concerning his driving, while admissible, is not controlling on the issue before us. The consideration to which such protests may have been entitled from the appellant depended upon their justification.

■ II. Appellant assigned error because the court, in instructing upon the signed statement of appellee, heretofore referred to, told the jury that it could be considered only as bearing upon the credibility of the appellee as a witness and not as proving any substantive fact. The instruction was duly excepted to. This statement was admitted generally without any restriction as to its consideration, over appellee's objection that it was incompetent. The instruction unduly and improperly limited the consideration of the statement by the jury. It was proper for the jury to consider it not only in its bearing upon appellee's credibility as a witness, because inconsistent with his testimony, but since it was a deliberate statement over his own signature it was admissible not merely as discrediting the testimony of appellee, if the statement was believed by the jury, but as substantive evidence against him and as bearing upon the worthiness of his whole claim. Castner v. Chicago, B. & Q. R. Co., 126 Iowa 581, 585, 586, 102 N. W. 499. The appellee was not only a witness but a party-opponent of appellant, and even though he had not taken the stand as a witness the statement was admissible against him and his case, as based upon his pleadings and the testimony relied upon by him, as a discrediting inconsistency on his part. II Wigmore on Evidence, Second Ed., sections 1048, 1053. The giving of the instruction was reversible error.

■ III. Appellant assigns error for the overruling of his motion for new trial, but states:

"We are convinced that the defendant, on the law, facts and record, is entitled to reversal of the judgment, with an order directing the lower court to set aside the verdict and enter a judgment for the defendant and if we are wrong and are not entitled to a reversal and judgment, we do not want simply a new trial, without a judgment for the defendant."

It has been the uniform rule of this court that a general order of reversal in a law action cancels the district court judgment and sends the case back for a full retrial of the entire case, even though the reversing opinion was based upon the insufficiency of plaintiff's evidence. Landis v. Interurban Ry. Co., 173 Iowa 466, 469, 154 N. W. 607; Owens v. Norwood-White Coal Co., 181 Iowa 948–950, 165 N. W. 177; Perry-Fry Co. v. Gould, 217 Iowa 958, 960, 961, 251 N. W. 942; Buttman v. Christy, 197 Iowa 661, 663, 664, 198 N. W. 314; Eclipse Lumber Co. v. Davis, 201 Iowa 1283, 1289, 207 N. W. 238; Hawthorne v. Delano, 183 Iowa 444, 167 N. W. 196; Taylor v. Burgus, 221 Iowa 1232, 1235, 1236, 262 N. W. 808. If on retrial no new evidence was offered or the record was not materially different from upon the first trial, the finding of this court upon that evidence would be conclusive against the appellee. Hawthorne v. Delano, supra, 183 Iowa 444, 446, 167 N. W. 196. Before the adoption of the new Rules of Civil Procedure, and under section 12871 of the 1924 and subsequent Codes, we have ordered judgment where it clearly appeared that each party had fully presented his case, and that the record on a retrial would very likely not be different. Wilson v. Findley, 223 Iowa 1281, 1300, 275 N. W. 47; McCornack v. Pickrell, 231 Iowa 737, 742, 743, 2 N. W. 2d 57. Section 12871 has been superseded by the new Rules.

But Rule 349 of the new Rules provides that when a judgment is reversed for error in overruling a motion to direct a verdict, and the granting of the motion would have terminated the case in favor of appellant, this court may enter, or direct the trial court to enter final judgment as if the motion had been initially sustained; provided that, if it appears from the record that the material facts relating thereto were not fully developed

at the trial, or if, in the opinion of this court, the ends of justice will be served thereby, a new trial shall be awarded of such issue or of the whole case.

In the case before us all of the persons in the car. testified. There is nothing in the record to indicate that other persons might have seen the accident at the bridge or the manner in which the car had proceeded. There might possibly be other persons who could give some testimony bearing upon the issues involved but it seems unlikely that they could throw any additional light on the issue of reckless operation.

In Taylor v. Burgus, supra, 221 Iowa 1232, 1235, 1236, 262 N. W. 808, the appellant made the same request as that made by appellant here, and this court refused to rule upon assignment that the trial court erred in refusing to sustain his motion to direct a verdict, and summarily accepted appellant's request, and affirmed the judgment for appellee.

In the appeal before it is our conclusion that the court erred in not sustaining appellant's motion for a directed verdict. The judgment is therefore reversed and remanded and the district court is directed to enter judgment for the appellant in conformity herewith.—Reversed and remanded with instructions.

MILLER, C. J., and HALE, OLIVER, WENNERSTRUM, GARFIELD, SMITH, MULRONEY, and MANTZ, JJ., concur.