KENNETH R. KRELL, appellee, v. HAROLD S. MAY et al., appellants.

CAROL KRELL, by her father and next friend, KENNETH R. KRELL, appellee, v. HAROLD S. MAY et al., appellants.

No. 52473.

(Reported in 149 N.W.2d 834)

APRIL 4, 1967.

Westfall, Laird, Burington, Bovard & Heiny, of Mason City, for appellants.

Hobson, Cady & Drew, of Hampton, and Lundy, Butler, Wilson & Hall, of Eldora, for appellees.

LARSON, J.—This is an action for damages for personal injuries brought by Carol Krell, a minor, by her father and next friend, Kenneth R. Krell, and by the father for medical expenses and loss of services against the defendants, Harold S. May and his son Stephen May, as a result of a one-car accident near Hampton, Iowa. The cause was pleaded in three divisions. Division I alleged contract and negligent breach of duty plus negligent entrustment, Division II contract and negligent breach of duty, and Division III reckless operation of the father's automobile by Stephen. The trial court directed a verdict for defendants on Divisions I and II and submitted Division III. The jury returned a verdict for Carol Krell for $40,000 and a verdict for her father, Kenneth Krell, for $10,000. When defendants' motion for judgment notwithstanding the verdict was overruled, defendants appealed. Appellees cross-appealed from the verdict directed against them on Divisions I and II.

Insofar as appellants are concerned, the sole question presented here is as to the sufficiency of the evidence to generate a jury question on recklessness. Appellees' cross-appeal was submitted in the alternative and is to be considered only in case we should reverse on the recklessness issue.

I. Our first consideration, therefore, is as to the sufficiency of the evidence of reckless operation of the automobile in which Carol, Stephen, and Ramona Schumacher were riding when the accident occurred. The jury's findings are binding upon us if supported by substantial evidence, and upon this appeal

we view the evidence in the light most favorable to plaintiff. See rule 344f(1)(2), Rules of Civil Procedure; Tuttle v. Longnecker, 258 Iowa 393, 138 N.W.2d 851. In applying this rule we must, of course, keep in mind that it is plaintiffs' burden to prove the necessary elements of recklessness. Beletti v. Schuster, 253 Iowa 1166, 1169, 115 N.W.2d 858, 860, and citations. It is unnecessary to again repeat the various definitions of reckless operation we have used in considering section 321.494 or to restate the several elements thereof heretofore recognized by us. Generally stated, we have required evidence of conduct which shows no care, coupled with disregard for consequences, an absence of heed or concern for consequences to others. Fundamentally, we are concerned with the mental attitude of the operator of the vehicle. Martin v. Cafer, 258 Iowa 176, 138 N.W.2d 71; Fritz v. Wohler, 247 Iowa 1039, 1045, 78 N.W.2d 27, and citations; 8 Am. Jur.2d, section 489, page 57; 6 A. L. R.3d, section 2(a), page 774; 8 Drake Law Review 128.

In Martin v. Cafer, supra, we said at page 179 of 258 Iowa, 74 of 138 N.W.2d: "(2) There must be evidence of defendant's knowledge, actual or chargeable, of danger and proceeding without any heed of or concern for consequences."

In Fritz v. Wohler, supra, we quoted with approval from Nesci v. Willey, 247 Iowa 621, 624, 75 N.W.2d 257, as follows: "To constitute recklessness under the guest statute, conduct must be more than negligent and must manifest a heedless disregard for or indifference to the consequences or the rights or safety of others. It, of course, need not involve moral turpitude or wanton and willful misconduct. Harvey v. Clark, supra [232 Iowa 729, 6 N.W.2d 144, 143 A. L. R. 1141]. *There must be an awareness, actual or constructive, of the unusual danger presented by the circumstances, and also a manifestation of 'no care.'* Schneider v. Parish, supra [242 Iowa 1147, 49 N.W.2d 535]. We have frequently and consistently held that conduct arising from mere inadvertence, thoughtlessness or error in judgment is not reckless. Harvey v. Clark, Olson v. Hodges [236 Iowa 612, 19 N.W.2d 676] and Schneider v. Parish, all supra, and cases cited therein." (Emphasis added.)

In 8 Am. Jur.2d, supra, section 489, Automobiles and Highway Traffic, at page 57, it is stated: "Some guest statutes provide that a gratuitous guest riding in a motor vehicle has no right to recover against the owner or operator thereof for injuries sustained, *except* where such injuries result from the latter's reckless disregard of the consequences, or heedlessness. This means an absence of heed or concern for consequences, a heedlessness of danger, a wanton disregard or *conscious indifference to consequences, implying a consciousness of danger and a willingness to assume the risk, or an indifference to consequences."* (Emphasis added.)

In 6 A. L. R.3d, Guest Statute, section 2(a), at page 774, we find as to a driver's conduct, duty and care toward a guest, the following: "Although there are no absolute rules in cases of this kind, and each case is to be judged in the light of the concomitant circumstances, many courts in jurisdictions having automobile guest statutes use the subjective element as a criterion in the determination of the defendant's conduct, that is, whether the host driver knew or should have known of the impending danger inherent under the surrounding circumstances, and hold that his excessive speed or his failure to slow down in the face of such danger implies gross negligence, wantonness, recklessness, or other similar degree of culpable conduct. A warning on the part of the guest or his request to slow down, in connection with the persistence on the part of the driver in continuing to drive at an excessive rate of speed, has been frequently stressed by the court as showing the necessary knowledge on the part of the defendant driver that serious injury to the guest would probably result from the speed at which he was driving under the circumstances. Resort to the subjective criterion by most courts explains why a case under the automobile guest statutes cannot be based on the doctrine of res ipsa loquitur, although this does not mean that gross negligence, wantonness, or recklessness may not be shown by circumstantial physical evidence. And while emphasis is placed on the automobile operator's attitude of mind which imparts to an act of misconduct a tortious character under the guest statute, this does not mean that objective acts of the

operator are overlooked. The fact is that the attitude of the operator may be gauged from his acts and conduct exhibited prior to the accident. When, notwithstanding his awareness of an unusual danger and the common probability of injury to his guests, he persists in driving at a high rate of speed in utter disregard of the safety of his passengers, then he has manifested gross negligence, recklessness, or the like under the pertinent guest statute."

The following circumstances are revealed by the record: At the instance of his father, Stephen, age 16, Carol, and Ramona, left the A & W Drive-In located on Highway 65 at the north edge of Hampton at about 11:15 p.m. on July 28, 1963, in Mr. May's car, for the purpose of taking the girls home. They had been working at the drive-in as "carhops". However, on their own they first decided to take a ride. Although they drove to Ramona's home to inform her grandmother of their intention, Carol did not want to stop at her home "because she knew her parents would not let her go."

Due to amnesia suffered by both Stephen and Carol as a result of their injuries in the accident, the only direct evidence of the events thereafter leading up to the accident was given by Ramona, who sat between Stephen and Carol in the front seat of the May automobile. She testified they drove northwest of Hampton into the Beed's Lake area, turned around at the west end of the lake and started back. This road was narrow, curvy and lined with trees close to the travel lane. She said Stephen drove so fast on this stretch of road that it alarmed her and she asked him to slow down. He did slow down and left the park area without mishap, proceeded eastward on a gravel road and crossed Chapin Road, which was a stop road, without making a stop. He did stop a mile farther on at Highway 65. She recalled no conversation about the stop-sign-running, but said when they stopped at Highway 65 she wanted to go home. Someone said they were close to Robinson Park and suggested they drive over there and then go home. It was agreed, and they proceeded eastward down a hill on a new blacktop roadway, a drop of roughly 24 feet in about 2470 feet. The road then again

became gravel. The blacktop was 21 feet 6 inches wide and the gravel road 27 feet wide. Ramona testified: "Going down that hill the speed was accelerating continually from the time we crossed Highway 65 and up until the time of the accident." She did not drive a car and did not estimate their speed, but said as they "were going down the blacktop road going east I was scared." Near the end of the blacktop the road started up a slight slope, $2\frac{1}{3}$ feet rise per 100 feet, and after they reached the gravel she said that although she was looking straight ahead and did not look at Stephen, she "looked at the steering wheel. * * * I observed Steve's hands going back and forth and the steering wheel with them from side to side." She was not sure whether the speed then stayed the same or whether it was still accelerating. She did not know how many times the car was turned either to the right or to the left, but knew it was being turned. She did not know for sure whether the brakes were applied, but said: "When the brakes are applied you can feel that in the car. I did not feel anything like that that night." She said the speed of the car at that time was faster than the speed of the car out at the lake. "It was enough faster to make me more scared than I was at the lake." She testified: "I said something to the effect 'Steve, stop it' or 'slow down'" just before they went into the ditch. She remembers going into the ditch, but nothing thereafter until she was being removed from the field where she had been thrown from the car.

On cross-examination she testified there was no "horseplay" going on, that they were all congenial and no one was angry at anyone in the car. She said it was after they reached the gravel that the car started to sway, that she did not know whether the back end swayed or the car turned one way or the other, and that she observed nothing about Stephen that would lead her "to believe that he was not trying to control that car when it started to sway." She could not tell whether Stephen was trying to get the car under control by turning the wheel when it was going from one side of the road to the other.

Highway Patrolman Wilson, called to the scene of the accident, examined the area and observed the course of this car be-

fore and after it left the roadway. He testified he observed the spot where the car, then headed northeast, went into the north ditch, and he traced the wheel marks back some 300 feet. He saw "skid marks." Starting on the west end he found "the car went to the right shoulder and then in big swooping curves went to the left shoulder, back to the right shoulder, and then to the left and into the ditch." The beginning of these swoops was about 300 feet east of the end of the blacktop where there was considerable loose gravel. He observed definite marks down through the gravel near the shoulders where it was "kicked out" such as would be made by a car turning.

Wilson also testified the May car was found 15 to 20 feet north of the traveled part of the highway in an adjacent field, some 160 or 170 feet from the place it left the highway. It was facing south and appeared to have rolled or tumbled end over end. Apparently all occupants were thrown out and the car was practically demolished. He was not permitted to express his opinion as to the speed of the car when it reached the area of this accident. He testified the night was clear, the roadway dry, and the surface of the road where the car went into the ditch was in good condition.

Ronald Aschbrenner, age 19, serving in the Navy, testified by deposition taken on May 18, 1965. He and several companions were in the vicinity of this accident on the night of July 28, 1963. They were on another road about a mile away, heard the crash, and hurried to the scene, approaching it from the east. They were the first persons at the scene and called for the ambulances and authorities. He said no response could be obtained by questions to Stephen and Carol, but Ramona, when asked how many were in the car which was then on fire, told him three. All were then located and removed to hospitals.

II. The Iowa guest statute has been before this court many times, several in the past year. Under varying sets of facts there have been diverse rulings. There are many in which it has been held a jury question was engendered, among them being Tuttle v. Longnecker, supra, 258 Iowa 393, 138 N.W.2d 851; Martin v. Cafer, supra, 258 Iowa 176, 138 N.W.2d 71; and

Hebert v. Allen, 241 Iowa 684, 41 N.W.2d 240. There are many in which a directed verdict was held required, among them being Vipond v. Jergensen, 260 Iowa 646, 148 N.W.2d 598; Shoop v. Hubbard, 259 Iowa 1362, 147 N.W.2d 51; Beletti v. Schuster, supra, 253 Iowa 1166, 115 N.W.2d 858; and Schneider v. Parish, 242 Iowa 1147, 49 N.W.2d 535. Some are extremely close and, although we have said no hard-and-fast rule which will apply to all situations can be devised, we have often referred to general principles which should be kept in mind in these cases. Shenkle v. Mains, 216 Iowa 1324, 1328, 247 N. W. 635, 637. We have often said it is imperative for courts and lawyers to recognize a substantial distinction between negligent and reckless operation of a vehicle, that the general rule laid down by the guest statute is that a guest cannot recover, that to recover a passenger must show he comes under the exception, and that the exception is not to become the rule by too liberal judicial construction. Also see Russell v. Turner, 56 F. Supp. 455, for a review of this applied principle.

Under the evidence produced herein the trial court felt this case came within the exception, and we agree.

In several of our recent cases we make the statement that "Reckless operation of a motor vehicle as used in section 321.494, Code, 1962, means more than negligence, more than want of ordinary care. It means, proceeding with no care coupled with disregard for consequences, the acts must manifest a heedless disregard for or indifference to the rights of others in the face of apparent danger or danger so obvious the operator should be cognizant of it, when the consequences of such actions are such an injury is a probability rather than a possibility. Recklessness may include willfulness or wantonness, but if the conduct is more than negligent it may be reckless without being willful and wanton." Martin v. Cafer, supra, 258 Iowa 176, 179, 138 N.W.2d 71, 73; Shoop v. Hubbard, supra; Delay v. Kudart, 256 Iowa 523, 530, 128 N.W.2d 201.

Perhaps in referring to these elements we have neglected to stress the primary objective we seek, namely, the driver's mental attitude as disclosed by his acts and conduct immediately prior to and at the time of the accident.

In Hebert v. Allen, supra, 241 Iowa 684, 689, 41 N.W.2d 240, 243, in discussing the evidence sufficient to justify a submission of the reckless issue, we said: "Neither court nor jury has any way to learn the mental attitude of the driver except by inference from his conduct." In Mescher v. Brogan, 223 Iowa 573, 581, 272 N. W. 645, 650, we find: "It is the actions and conduct * * * that measure the degree of care and determine whether or not one is proceeding * * * with a heedless disregard for * * * the rights of others." Thus, if there is substantial evidence as to the driver's "actions and conduct" at or near the place of the accident from which a fair inference of recklessness may be drawn, there is generated a jury issue. This is especially true where there is substantial evidence that the operator of the vehicle had actual knowledge of an existing danger in time to avoid it. However, when we come to the area where it may be said the danger was apparent or so obvious that the operator should be cognizant of it and proceeds without any heed of or concern for the consequences, we are indeed in a hazy zone and an area where inferences must be used with care lest we hopelessly confuse the distinction between negligence and recklessness. In other words, it must appear there was actual or implied awareness of the unusual danger presented by the circumstances along with a manifestation of no care. Nesci v. Willey, supra.

The question here presented is whether evidence of Stephen's actions regarding speed and control, his awareness of the situation and circumstances then and there existing, was sufficient to sustain a finding of recklessness as we have heretofore defined it. The trial court carefully reviewed his actions on this trip and concluded a jury question was generated. In passing on defendant's motion for judgment notwithstanding the verdict, it summed up the evidence as to Stephen's conduct on this apparent joyride after work by saying:

"He [Stephen] did not conduct himself thereafter as a driver who was merely inattentive at the moment and therefore negligent. In the narrow winding road at Beed's Lake he drove so fast that Ramona Schumacher thought he would hit the trees and fail to make the bridge, and she remonstrated. She was

scared * * *. Thereafter Stephen came to the intersection with the highway leading from Hampton northward to Chapin. That highway is protected by stop signs, but Stephen saw fit to ignore them and drive on through. This is beginning to show a mind not merely inattentive or careless, but a mind apparently bent on showing off to thrill or frighten the girls in the car.

"Then we come to the upset scene. Stephen leaves Highway 65 driving eastward and accelerates to the point of upset. This was a considerable distance, downhill, and he had an eight-cylinder Pontiac automobile. He must have been going at a very excessive speed indeed by the time of the upset—and the wreckage and injuries confirm that belief. Back from the upset, he turns the car from one side of the road to the other at high speed, and there is no direct evidence whatsoever that this was merely due to negligent lack of control. He was seen by Miss Schumacher to turn the wheel to one side and then the other, and she was very frightened and exclaimed aloud to him. The jury could well infer that Stephen intended to do this thing that he in fact did, especially in view of his previous conduct in showing off and causing fright. If he was deliberately swaying the car at high speed, and the jury could reasonably so find, the jury could also find that he had that heedless disregard for consequences which constitute recklessness.

"Defendants urge that Stephen came off the blacktop at moderate speed, or even at a good clip, hit loose gravel, and through inexperience or perhaps inadequate lookout merely lost control. If that is so, he was merely negligent. But defendants' contention overlooks a number of circumstances which the jury could consider. From the physical facts the jury could find very high and dangerous speed. Moreover, Miss Schumacher testified Stephen accelerated all the way from Highway 65 to the upset, downhill with a Pontiac car. * * * Prior to the upset he was seen turning the wheel from one side to the other, and the jury could infer this was a part of his continuing conduct in showing off. This entire picture is a far cry from a simple negligence case in which a driver merely strikes loose gravel, loses control, and goes into the ditch. The jury would have been warranted

in finding that it was a case of negligence, but on the whole case they were also warranted in finding recklessness."

While there was no direct evidence as to the speed he attained before the accident, under the revealed circumstances it was sufficient to alarm one of his passengers, completely wreck the car, and seriously injure the occupants. Prior to the stop at Highway 65 Ramona Schumacher had asked him to slow down under the conditions then existing. It is clear he had timely warning of his chance-taking and excessive speed. A jury could find, and evidently did, that his acts were not inadvertent or thoughtless. Perhaps he ran the Chapin Road stop sign inadvertently, but the fact that he did run it might also be significant as to his mental attitude of chance-taking on this whole venture. True, it does not appear he knew where the blacktop road ended and the gravel road began, and it appears there were no warning signs thereof. However, it does appear he did not slow or attempt to slow down after he came upon the gravel. He had been over this road many times and was familiar with its general extent and contour, including a "T" intersection with a north-south road less than a half mile to the east.

It is defendants' contention that this evidence merely shows Stephen reached the gravel unexpectedly, lost control of his vehicle in excessive loose gravel and went into the ditch, that since there were no signs warning of the end of the blacktop, this evidence disclosed nothing more than negligence in his attempt to control his car after the difficulty arose. They cite Goodman v. Gonse, 247 Iowa 1091, 76 N.W.2d 873, and Beletti v. Schuster, supra, 253 Iowa 1166, 115 N.W.2d 858, for the proposition that even if his speed had been excessive over the blacktop, this constituted no more than a mere error in judgment or momentary inadvertence, and that he did the best he could to avoid the accident when he discovered the danger. We agree the jury could so find under this evidence, but do not agree that we may do so as a matter of law.

On the other hand, Ramona Schumacher clearly stated that when Stephen turned the wheel to the right the car went to the right, and when he turned it to the left the car went to the left.

This would tend to refute a skidding contention, for as is generally known, to reduce a skid one turns the wheel in the direction of the skid. This would indicate that the car was being driven on these swooping turns, not sliding sideways, and that the power was on until just before they went into the ditch.

There is no evidence that Stephen applied his brakes or attempted to slow down after he reached the gravel. The jury could find he did not, that his swerving did not commence until after he had gone 300 feet past the end of the blacktop, that the marks were made by intentional turning of the steering wheel much like the driver did in Tuttle v. Longnecker, supra, to thrill the passengers, and that only during the last few feet was there any hint that the brakes were on or the tires were sliding. On the other hand, Aschbrenner testified he and his companions arrived at the scene from the east at about 60 miles per hour and had no difficulty in stopping on this road. Their car did not sway, swerve or skid in the process of stopping in the general vicinity where Stephen's car had left the road.

The picture exhibits disclose a dry hard-surface road with some loose gravel where the blacktop ended, but little at the place where the car left the road or 300 feet back of that spot. The lights of the car were adequate and objects 600 feet away were clearly visible. The car was in good mechanical condition and there is evidence that it could be stopped with full application of the brakes in 50 or 60 feet at 50 miles per hour, and 100 feet at 70 miles per hour on this gravel road.

III. Although the evidence of deliberate swerving back and forth across the road is not as clear nor for as long a period as in the Tuttle v. Longnecker case, supra, our statement therein on page 398 of 258 Iowa is applicable here: "It is not for us to determine whether defendant was reckless. Our review is not de novo but for correction of errors at law. Rule 334, R. C. P. Our function is to decide whether the evidence is such that an inference of recklessness may be fairly drawn therefrom. * * * We are not prepared to hold an inference of recklessness is not permissible here. As before indicated, the jury had a right to believe, and evidently did, that defendant deliberately caused

the car to swerve back and forth across the gravel road for about one-half mile heedless of the protest of one of the passengers in an attempt to scare them. * * * The jury could further find, what experience teaches, that injury from driving in this manner was probable, not merely possible."

IV. There were no objections to the court's instructions to the jury and we are satisfied the jury had a right to determine the issue of recklessness thereunder. We are also satisfied the court committed no error in overruling defendants' motion for judgment notwithstanding the verdict and therefore affirm the judgments rendered.

In view of appellees' desire that in the event we affirm on the recklessness issue no consideration need be given their cross-appeal, we do not consider the interesting issues therein presented.—Affirmed on defendants' appeal.

All JUSTICES concur except THORNTON, J., not sitting.