[No. 44382. En Banc. January 12, 1978.]

RAYMOND GOODELL, *Petitioner,* v. ITT–FEDERAL SUPPORT SERVICES, INC., *Respondent.*

*Critchlow, Williams, Ryals & Schuster* and *David E. Williams,* for petitioner.

*Gavin, Robinson, Kendrick, Redman & Mays, John Gavin,* and *Michael W. Leavitt,* for respondent.

BRACHTENBACH, J.—Plaintiff was employed by Atlantic Richfield Hanford Company as a boilermaker–welder at the Richland nuclear works. Defendant ITT–Federal Support Services, Inc., had a contract with the Atomic Energy Commission to "inspect, maintain and render safe" a government owned welding machine made available for use by plaintiff. The welding machine was energized by electricity. Plaintiff contended that in the course of his employment, while using the welder, he received two electrical shocks. The first shock occurred in 1968. No claim is made against this defendant as to that shock and its consequences. However, plaintiff alleges that a second shock occurred in early 1970 and that his traumatic neurosis condition is a result of

the 1970 shock. Plaintiff's action is based upon the defendant's contractual responsibility to inspect, maintain and render safe the welding machine which he used.

A judgment for plaintiff was entered upon a jury verdict. The Court of Appeals reversed and remanded for a new trial. *Goodell v. ITT–Federal Support Servs., Inc.*, 15 Wn. App. 639, 550 P.2d 1171 (1976). We granted a petition for review. We reverse the Court of Appeals and affirm plaintiff's judgment.

To deal with the two issues raised on review, it is necessary to detail the facts. Plaintiff was engaged in fabricating a heat exchange vessel, a large metal container. A welding unit which the plaintiff was using used an AC current to generate a DC current. The unit was on wheels but had been used in the same location for 5 years. The welding unit was grounded to the building in which it was located. An uninsulated shunt had been attached to the welding machine. It conducted electricity from the generator to the welding leads. Its purpose was disputed. Some witnesses said it was to facilitate changing welding leads by clamping them directly to the shunt; other witnesses believed that instruments would be clamped to the shunt to get a reading on the electrical output.

It was undisputed that in both shocks, if in fact the second one occurred, the uninsulated energized shunt slipped out of position and came in contact with the metal case of the welding unit. Electricity thus shorted through the ground into the building and into an overhead crane which the plaintiff grasped in connection with his work on the metal vessel.

In both incidents the plaintiff, in the course of his normal work, reached for and took hold of an uninsulated crane hook. Electrical energy had thus shorted into the welding machine case, into the building ground, into the overhead crane, into the crane hook and when he touched the crane hook, into the plaintiff. In both instances, the presence of a dangerous level of voltage in the crane hook was confirmed by subsequent testing.

Plaintiff was treated for the 1968 shock, applied for workmen's compensation benefits, but continued to work. Plaintiff contends that the 1970 shock occurred in January or February of that year. He left employment in April of 1970 and has never returned. Defendant challenges the very occurrence of the 1970 shock and argues, even if it happened, the plaintiff's condition is related to the 1968 shock.

Plaintiff's petition for review raised two issues decided by the Court of Appeals. No other issues are before this court.

First, did the trial court err in instructing that RCW 19.29.010 (Rule14)[1] was applicable to this defendant? This is the major contention between the parties. Defendant argues, and the Court of Appeals agreed, that RCW 19.29 set standards only for those entities which distribute electric power and to equipment installed within a structure for the receipt and further distribution of electricity. The Court of Appeals held that this welding machine was not within the ambit of the statute. Plaintiff argues that the statute sets a standard of conduct not only for the distribution of electric power, but also for the maintenance and use of electrical apparatus.

RCW 19.29 is hardly a model of clarity as to legislative intent. As noted by the Court of Appeals, a 1965 amendment (Laws of 1965, 1st Ex. Sess., ch. 65, § 1) was entitled "An Act relating to electrical construction." The 1965 amendment was to the 1913 law which was entitled "An Act relating to electrical construction and the maintenance and use of electric wires, apparatus and appliances . . .", Laws of 1913, ch. 130, § 1.

██ ██ Defendant argues that the requirements of RCW 19.29 apply only to electrical power companies. If that were the legislative intent, the statute failed to so express and limit its application. By its express terms, it applies to the State of Washington, any county, city, or other political

---

[1] "Rule 14. All energized wires or appliances installed inside of any building or vault, for the distribution of electrical energy, shall be sufficiently insulated, or so guarded, located, or arranged as to protect any person from injury." RCW 19.29.010.

subdivision, or to any other person, firm or corporation. The statute makes it unlawful to *run,* place, erect, *maintain or use* any electrical apparatus or construction except as provided in the statute. RCW 19.29.010.

The subparts of the act likewise dictate a broad application. RCW 19.29.010 (Rule 4) refers to telephones, telegraphs, call bells, fire and burglar alarms. Rule 10 applies to support fixtures on roofs of buildings which may well be private rather than part of the power company distribution scheme. Rule 12 applies to trolley wires. Rule 32 governs work on *any* live wire, cable or appliance. There is no indication that the statute applies only to power company activities.

Rather we believe that the legislature intended that the basic safety rules of RCW 19.29 would apply to all persons and firms, within its scope, when distributing or using the hazardous and potentially lethal electrical current.

The fact which makes the statutory code particularly applicable to these circumstances is that the welder was not simply a device which was plugged into a wall plug and which used available electricity. If that were the case, it would be a different matter. A simple appliance which merely plugs in and consumes electricity is not what the statute is about. Rather, here, there was an apparatus which took four times the ordinary circuit voltage, generated a different current, distributed it for an industrial purpose, after being specifically grounded into a complex system of extremely hazardous potential. One can hardly equate the plugging in of a toaster with the potential of the plaintiff becoming the final link of the electrical circuit within this welding unit.

The statute says that no person, firm or corporation shall maintain or use any electrical apparatus except as provided in the rules of the statute. Rule 14 states that energized wires or appliances for the distribution of electrical energy shall be insulated or guarded as to protect any person from injury. The shunt was energized, it was installed as an integral part of the welding device, for 5 years it distributed

electricity without which the welding unit would not function.

We conclude that Rule 14 imposes a duty on defendant to maintain the welding device in a manner sufficient to protect the plaintiff from electrical shock. Therefore, it was proper for the court to instruct the jury that violation of that statute by defendant is negligence as a matter of law.

The second issue upon which review was granted related to the defendant's cross–examination of plaintiff. Defendant sought to introduce testimony and documentary evidence that plaintiff had filed an industrial insurance claim, an application to reopen that claim and claims with private insurance carriers, all of which attributed his claimed injuries to the 1968 incident rather than the 1970 shock for which he was claiming damages from defendant.

Upon plaintiff's motion in limine and upon defendant's offer of proof, this proposed evidence was not allowed. Defendant recognized that it was not entitled to introduce evidence of compensation from collateral sources. However, defendant earnestly contended that it was entitled to introduce evidence, not to prove compensation, but to prove that defendant related his condition to the 1968 shock rather than to the 1970 incident.

There are two controlling principles. First, the admission of evidence largely lies within the sound discretion of the trial court. Absent abuse of that discretion, there is no error. *E.g., Hill v. C. & E. Constr. Co.,* 59 Wn.2d 743, 370 P.2d 255 (1962).

Second, in evaluating the offered evidence, the trial court and this court need to evaluate the probative value of the offered evidence in the defendant's case versus the prejudicial effect upon the plaintiff's case. *Rothman v. North Am. Life & Cas. Co.,* 7 Wn. App. 453, 500 P.2d 1288 (1972).

Doctors, including psychiatrists, testified for the plaintiff and for the defense. Defendant's theory that plaintiff related his condition to the 1968 shock was borne out by his vague testimony as to whether or not he had

mentioned the second shock to various treating and examining doctors. Other doctors stated that he mentioned the second shock. In short, the defense theory was presented to the jury. While it might have been more effective to present documentation of claims in connection with industrial insurance and private coverage, it was only cumulative and it cannot be said that the defense theory was not presented to the jury. Injection of any industrial insurance coverage or private carrier coverage might well have been more prejudicial than helpful to the jury and we cannot say that the trial court abused its discretion.

The decision of the Court of Appeals is reversed and the judgment of the trial court affirmed.

WRIGHT, C.J., and ROSELLINI, HAMILTON, UTTER, HOROWITZ, and DOLLIVER, JJ., concur.

STAFFORD, J. (dissenting in part)—I agree with the majority insofar as it holds (1) that RCW 19.29 is not limited in application to those entities which merely distribute electric power; and (2) that the trial court did not abuse its discretion in granting petitioner's motion in limine. However, I do not agree that the legislature intended RCW 19.29.010 (Rule 14) to apply to mobile welding machines of the kind here involved. Rather, Rule 14 was intended to apply to energized wires or appliances *installed* inside respondent's facility. This welding unit was not *installed,* but was detachable, mobile, and could be used elsewhere. Consequently, I would affirm the Court of Appeals on this issue albeit for different reasons.

Generally, the violation of an applicable statute is negligence per se. *Bayne v. Todd Shipyards Co.,* 88 Wn.2d 917, 568 P.2d 771 (1977). As we stated in *Kness v. Truck Trailer Equip. Co.,* 81 Wn.2d 251, 257, 501 P.2d 285 (1972), citing Restatement (Second) of Torts § 286 (1965):

> The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative

enactment . . . whose purpose is found to be exclusively or in part

. . .

(d) *to protect that interest against the particular hazard from which the harm results.*

(Italics mine.) *See also Bayne v. Todd Shipyards Co., supra* at 929. Before one may apply the standard of conduct expressed in Rule 14 to this case, one must find a legislative intent that it apply. Unlike the majority, however, I cannot find a legislative intent to protect one against the particular hazard from which the harm here resulted.

Words used in a statute must be given their usual and ordinary meaning unless a contrary intent appears. *Strenge v. Clarke,* 89 Wn.2d 23, 28, 569 P.2d 60 (1977). The ordinary meaning of the word "install" is "to set up for use or service." *Webster's Third New Int'l Dictionary* 1171 (1971). *See also State v. Jones,* 242 N.C. 563, 89 S.E.2d 129 (1955); *Louisville v. Jefferson County Fiscal Ct.,* 307 Ky. 818, 212 S.W.2d 107 (1948); *Smith v. Kappas,* 218 N.C. 758, 12 S.E.2d 693 (1941). Further, both "install" and "installation" when applied to machinery also have a similar technical meaning. *Webster's New Twentieth Century Dictionary* (2d ed. 1970) gives these definitions: "Install . . . to fix in position for use; as, we installed new light fixtures." "Installation . . . a complete mechanical apparatus fixed in position for use; as a heating installation." *See also Long v. Ulmer Mach. Co.,* 77 Cal. App. 66, 246 P. 113 (1926); *Paldanius v. Strauss,* 100 Ore. 497, 198 P. 253 (1921). Thus, neither the ordinary nor the technical definition of "install" lends itself to the majority's interpretation of Rule 14 which effectively defines "install" to include temporary or mobile equipment. The fact that Rule 14 was intended to apply only to appliances actually *installed* or *fixed permanently in place* is further evidenced by the more expansive words used by the legislature in the balance of RCW 19.29.010. For example, Rules 1, 2, 3, 4, 6 and 11 require specific safety features for wires or cables which are *run, placed, erected, maintained, or used.* Rule 5 requires

specific safety features for transformers which are *placed, erected, maintained, or used.* Rule 7 deals with transformer secondaries which are *strung or erected.* All of the foregoing rules connote *either* temporary *or* permanent electrical equipment. In contrast, Rule 14 applies *solely* to *permanent installations* and has no application to temporary electrical equipment, much less that which is mobile. Had the legislature intended Rule 14 to apply to the *mere use of mobile equipment,* it could easily have so stated as it did in Rules 1–6 and Rule 11.

It is a basic principle of statutory construction that no portion of a statute should be treated as superfluous, void or insignificant. *Hayes v. Yount,* 87 Wn.2d 280, 552 P.2d 1038 (1976). Yet, the majority opinion effectively renders the word "installed" superfluous by applying Rule 14 to a welding unit that admittedly is both temporary and mobile.

I also cannot ignore the legislature's amendment of Rule 14. Formerly Rule 14 read:

> All wires or appliances *carrying* a current of less than seventy–five hundred (7,500) volts . . . All wires or appliances *carrying* a current of over seventy–five hundred (7,500) volts . . .

(Italics mine.) Laws of 1913, ch. 130, § 1. In the place of "carrying" the legislature inserted "installed." One purpose of the amendment may have been to clarify that the rule applies solely to wires or appliances *inside* a building or vault. *Wray v. Benton County PUD,* 9 Wn. App. 456, 513 P.2d 99 (1973). *See also Vannoy v. Pacific Power & Light Co.,* 59 Wn.2d 623, 369 P.2d 848 (1962). But, I cannot overlook the fact that the legislature *also* deleted the word "carrying" and replaced it with the word "installed." Unlike the majority, I must assume there was a purpose in making that change. *Graffell v. Honeysuckle,* 30 Wn.2d 390, 191 P.2d 858 (1948). I am convinced the legislature amended Rule 14 for the additional purpose of excluding mobile electrical units from its coverage.

The majority takes the position that Rule 14 is particularly applicable here because:

the welder was not simply a device which was plugged into a wall plug and which used available electricity. If that were the case, *it would be a different matter.* A simple appliance which merely plugs in and consumes electricity is not what the statute is about . . . *One can hardly equate the plugging in of a toaster* with the potential of the plaintiff becoming the final link of the electrical circuit within this welding unit.

 . . . The shunt was energized, *it was installed as an integral part of the welding device* . . .

(Italics mine.) I agree that a "plugged in toaster" is not covered by the rule. Yet, this welding unit is the functional equivalent of a highly energized toaster which is "plugged into" an electrical power source to which the rule likewise has no application. The majority also misreads the statute when it concludes that "installation" as an integral part of the welding device satisfies the statute. It does not. The statute applies only *if* the device is actually *installed* inside a *building or vault.* Even were I to interpret the statute to apply to temporary mobile electrical equipment, I cannot agree that "installation" *as an integral part of the welding unit* satisfies the statutory requirement of installation inside a building or vault.

The legal principle that violation of a statute may be negligence per se has no application to this mobile unit which was not *installed* inside respondent's building. There being no indication of a legislative intent that Rule 14 applies, I would affirm both the trial court and the Court of Appeals on this issue.

HICKS, J. (concurring in part with the dissent)—I concur with the dissent of Stafford, J., except for his concurrence with the majority in its approval of the trial court granting petitioner's (plaintiff's) motion in limine. I am of the view the trial court abused its discretion in granting the motion and that defendant is entitled to a new trial on that ground.

The majority says absent abuse of discretion, the admission of evidence lies largely within the discretion of the trial

court and cites as authority *Hill v. C. & E. Constr. Co.,* 59 Wn.2d 743, 370 P.2d 255 (1962). *Hill* is not apposite in this instance. *Hill* is concerned with opinion evidence and the hypothesis upon which that opinion was based. The trial court rejected the evidence for failure to base the hypothesis on all the relevant facts in the case.

The only reason for permitting opinion evidence of an expert in any event is to assist and advise the trier of fact in instances where the testimony is beyond the understanding of the ordinary person. *Ewer v. Johnson,* 44 Wn.2d 746, 270 P.2d 813 (1954). Of course, the trial court must have wide discretion in determining whether opinion evidence is necessary, just as it must have discretion in controlling the use of demonstrative evidence and many other matters. But, relevant admissions of a party–opponent are not among those matters with which the trial court has such broad discretion.

For more than 75 years this state has recognized and applied the rule that relevant unprivileged admissions of a party–opponent are admissible against him. *Hart v. Pratt,* 19 Wash. 560, 568, 53 P. 711 (1898). Such evidence is not confined to the purpose of impeachment, but it is also entitled to be admitted as substantive evidence. E. Cleary, *McCormick's Handbook of the Law of Evidence* § 262, at 629 (2d ed. 1972). *Olson v. Hodges,* 236 Iowa 612, 19 N.W.2d 676 (1945) (error to instruct the jury that an admission could be considered merely as discrediting the party's testimony. Evidence was admissible not only as discrediting testimony of plaintiff, but as substantive evidence against him); *Greenwood v. Harris,* 362 P.2d 85 (Okla. 1961) (admissions of defendant physician, though the only expert evidence in an action for malpractice, is sufficient to defeat defendant's motion for a directed verdict at the end of plaintiff's case).

Defendant's efforts to show by plaintiff's own statements when he was making claims under state industrial and private insurance carriers that he attributed his injuries to the

1968 shock and that he made no mention of the 1970 incident, should have been allowed. Failure to mention a material circumstance presently being claimed which it would have been natural to mention in a former statement, is sufficient for admission of the former statement. C. McCormick, *Handbook of the Law of Evidence* § 34, at 64 (1954).

Further, the excluded evidence is admissible in this state under the circumstances of this case, despite the collateral source rule. *Rich v. Campbell,* 164 Wash. 393, 398, 2 P.2d 886 (1931). In *Rich,* a case involving the use of a prior insurance claim made by plaintiff, a limiting instruction was deemed sufficient to prevent misuse of the evidence by the jury.

As the Court of Appeals said in this case, *Goodell v. ITT–Federal Support Servs., Inc.,* 15 Wn. App. 639, 642, 550 P.2d 1171 (1976):

> Defendant's purpose was not to show that the plaintiff had been compensated, but to cast doubt upon his contention that a second shock had occurred.

If, as defendant contends, plaintiff had made no disclosure of or claim for the second shock until he filed a notice of trial amendment 2 years after its alleged occurrence and 9 months after commencing this action, admission of the proscribed evidence was vital to the defense of the case. Statements made by plaintiff after the date of the alleged second shock contained in his industrial insurance file should be admissible regardless of the laying of a foundation for impeachment. The statements when offered by defendant come in as admissions of a party–opponent. Their use is not confined to impeachment purposes, nor should their admission be constrained by impeachment rules. *Raborn v. Hayton,* 34 Wn.2d 105, 108, 208 P.2d 133 (1949).

The second reason offered by the majority to exclude the evidence is that:

> [I]n evaluating the offered evidence, the trial court and this court need to evaluate the probative value of the

offered evidence in the defendant's case versus the prejudicial effect upon the plaintiff's case. *Rothman v. North Am. Life & Cas. Co.,* 7 Wn. App. 453, 500 P.2d 1288 (1972).

I do not so read *Rothman v. North Am. Life & Cas. Co.,* 7 Wn. App. 453, 500 P.2d 1288 (1972). In that case the trial court excluded the evidence (a personalized check in the amount of $5 dated the day of the maker's death; the defense was suicide); the Court of Appeals reversed and found the check admissible, and said at page 456:

> In the trial of a case, any circumstance is admissible which reasonably tends to establish the theory of the party offering it, or to explain, qualify, or disprove the testimony of his adversary. *Robertson v. O'Neill,* 67 Wash. 121, 120 P. 884 (1912); *Bloomquist v. Buffelen Mfg. Co.,* 47 Wn.2d 828, 289 P.2d 1041 (1955). All facts which support a reasonable inference on a contested matter and any circumstances whereby an alleged fact may be proved or disproved are relevant. *Chase v. Beard,* 55 Wn.2d 58, 346 P.2d 315 (1959). . . . Evidence which has some logical proof tendency may nevertheless be excluded if it also has a tendency to mislead, distract, waste time, confuse or impede the trial. *See Diel v. Beekman,* 7 Wn. App. 139, 499 P.2d 37 (1972). *Coleman v. Dennis,* 1 Wn. App. 299, 461 P.2d 552 (1969). *None of these additional tendencies appear to be present in this case.*

(Italics mine.) That is exactly the case here under consideration—in my view none of the additional tendencies appear to be present. From defendant's point of view, it was the granting of the motion in limine which would have a tendency to mislead, for the whole story would not be told. *Rothman* is supportive of the admission of defendant's proffered evidence, not its exclusion.

The majority goes on to say that in any event,

> [T]he defense theory was presented to the jury. While it might have been more effective to present documentation of claims in connection with industrial insurance and private coverage, it was only cumulative and it cannot be said that the defense theory was not presented to the jury.

I cannot subscribe to such reasoning. The plaintiff is entitled to present his case to the trier of fact as effectively as he can within the rules. The defendant is entitled to no less. Because of the granting of the motion in limine, the defendant, in effect, was required to enter the trial of this case as handicapped as though it had one hand tied behind its back.

Defendant, as a matter of right, was entitled to have presented this evidence to the jury in as effective a manner as it could fairly devise. Further, defendant was entitled to have its theory of the case, based on that evidence, presented to the jury by proper instructions.

On the issue of the admissibility of evidence that qualifies as admissions of a party–opponent, the Court of Appeals is correct and should be affirmed. Defendant is entitled to a new trial.

Therefore, I dissent.

Petition for rehearing denied July 12, 1978.