[No. 44975. En Banc. August 10, 1979.]

CHARLES L. MAEHREN, ET AL, *Appellants,* v. THE CITY OF SEATTLE, ET AL, *Respondents.*

JOHN R. CHURCH, ET AL, *Appellants,* v. THE CITY OF SEATTLE, ET AL, *Respondents.*

*Carroll, Rindal, Kennedy & Schuck, James E. Kennedy,* and *Joel A. C. Rindal,* for appellants.

*Douglas N. Jewett, City Attorney,* and *Dona Cloud, Assistant,* for respondents City of Seattle, et al.

*Lembhard G. Howell,* for respondent Harris.

STAFFORD, J.—Appellants, employees of the Seattle Fire Department, seek review of a trial court decision upholding the Affirmative Action Program used by the Fire Department and the City of Seattle in the hiring and promotion of personnel. We affirm the trial court.

At the outset we emphasize that this case does not involve a loss of acquired seniority rights, the displacement of non–minority employees by minority employees, or the downgrading of non–minority employees to favor minority

employees. Further, the case does not involve the promotion of non–qualified minority employees in place of qualified non–minority personnel. All personnel, both minority and non–minority, have successfully completed the civil service examinations. The name of each man has been advanced to the civil service register as eligible for promotion to the positions in question. In short, this case involves promotion to vacant positions within the Fire Department.

The factual background of the case as evidenced by the pretrial order, the extensive testimony and documents produced at trial, and the findings of the trial court upheld below can be summarized as follows. Pursuant to a 1972 amendment to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* the City of Seattle is under a duty to refrain from engaging in racial discrimination in employment and to take affirmative action to eliminate the effects of past discrimination. A similar duty is mandated by Federal Executive Order 11246, Revised Order 4 of the United States Department of Labor's Office of Federal Contract Compliance, and RCW 49.60, all of which apply to the City. Recognizing this duty, the Mayor of Seattle issued an executive order in August 1972 establishing an affirmative action program for all departments of the City. The stated goal of this program was to increase the number of minorities, women, and persons over 40 years of age employed by the City to correspond with their statistical composition within the available work force of the City's population. The Mayor's Executive Order recognized that the condition of underrepresentation of such persons was "caused by present or past practices, customs or circumstances that have limited employment opportunities for members of the affected group." By Resolution 23849 and Ordinance 101548, adopted in October 1972, the Seattle City Council affirmed the Mayor's Executive Order and mandated the creation of affirmative action programs by all city departments.

The City's Affirmative Action Program was adopted in May 1973. The Seattle Fire Department had adopted an

Affirmative Action Program in September 1972. That program subsequently was revised by the Fire Department and approved by the Seattle Human Rights Commission in September 1976.

Both the City's and the Fire Department's programs approve the use of "selective certification" as a method of increasing minority representation in employment. Article 16, of the Seattle City Charter, establishes the basic method by which the Seattle Civil Service Commission is to certify eligible candidates for possible employment by the City. Initially a department head notifies the Commission of a vacancy. The Commission certifies either the top five eligible candidates, that is, those who have passed the civil service examination, or the top 25 percent of the eligible candidates, whichever is the greater. City Charter, art. 16, § 9. Pursuant to rule making power created by Article 16 the Commission promulgated Rule 7.03j providing for selective certification. Since 1971 the selective certification procedure has been available as an alternative method for certifying the highest ranking *eligible* minority candidates on the register not otherwise certifiable under regular procedures. Selective certification is used to implement the City's Affirmative Action Program when necessary to achieve increased representation of minority, female or handicapped employees. Such certification of a minority person may be requested by a department head and must be approved by the director of the Department of Human Rights and the Civil Service Commission. The rule allows selective certification only from the list of those *eligible* for the vacant position, that is, *only those who have successfully passed the civil service examination*. Further, only the highest ranking eligibles of a particular minority may be certified. Selective certification does not assure that a minority employee will be appointed to the position. Rather it assures that an eligible minority employee will be represented in the final pool of candidates from which the department head appoints. Selective certification is available to fill both entry–level and promotional vacancies.

In 1974, certain of the appellants took and passed a promotional examination for Fire Battalion Chief administered by the Civil Service Commission. These appellants are caucasian employees of the Fire Department. Each placed within the top quartile on the eligibility register and thus was eligible to be certified under regular procedures for the position of Fire Battalion Chief. Claude Harris, a black employee of the Fire Department, also took and passed the promotion examination for Fire Battalion Chief and was placed on the eligibility register. However, he did not place within the top quartile.

In 1976 three Fire Battalion Chief positions became available and the Fire Chief made a request for certification to fill these positions. No request was made for selective certification. Subsequently, the Commission made a regular certification of employees from the register which included appellants' names and also made a selective certification of Claude Harris, the only minority employee on the eligibility register. The Fire Chief appointed two persons from the regular certification and Claude Harris from the selective certification as Fire Battalion Chiefs.

The remainder of the appellants also are caucasian employees of the Fire Department. In 1974 each took and passed a civil service promotional examination for the position of Fire Lieutenant. Each placed in the top 25 percent of the eligibility register. Donald Taylor, a black employee of the Fire Department, took and passed the examination. Although he achieved the eligibility register, he did not place in the top quartile. Between November 1973 and May 1975, 14 Fire Lieutenant positions became available in the Fire Department. The Fire Chief filed requests for certification, one of which was a request for selective certification of an eligible racial minority employee. Appellants were among those certified under the regular procedure. One selective certification was made containing Taylor's name, the only minority employee on the eligibility register. Thirteen Caucasians and Taylor were appointed to these positions.

Those persons certified under the regular certification procedures but who were not appointed as Fire Battalion Chiefs filed suit challenging the selective certification procedures as violative of both Title VII of the Civil Rights Act of 1964, as amended, and the equal protection guaranties of the federal and state constitutions. Those who were certified but not appointed as Fire Lieutenants filed a similar suit. Both groups also challenged the selective certifications of Harris and Taylor as invalid for failure to comply with the procedures required by Rule 7.03j. Because they present the same issues, the two suits were consolidated for trial. The trial court upheld the statutory and constitutional validity of selective certification and the procedural validity of Taylor and Harris' certifications. Appellants obtained direct review of the trial court's decision by this court pursuant to RAP 4.2.

The preliminary issues raised by appellants are evidentiary in nature. Appellants challenge a number of findings of fact made by the trial court as either lacking in substantial evidentiary support or as overbroad and misleading. We do not agree with these challenges and affirm the trial court.

When findings of fact are challenged, our consideration is limited to whether there is sufficient evidence to support them. If such support is established, the findings will not be disturbed on appeal. *Culinary Workers Local 596 v. Gateway Cafe, Inc.,* 91 Wn.2d 353, 588 P.2d 1334 (1979); *Seattle–First Nat'l Bank v. Brommers,* 89 Wn.2d 190, 570 P.2d 1035 (1977). In reviewing the evidence, we will not substitute our judgment for that of the trial court. *Lantis v. Pfarr,* 67 Wn.2d 994, 410 P.2d 900 (1966).

The trial court found:

On October 20, 1971, the Seattle Civil Service Commission, by resolution, promulgated Civil Service Rule 7.03j which provides for selective certification of eligibles from any register other than in the normal order when necessary to implement the Affirmative Action Program of the City of Seattle to achieve ratios of minority, female

or handicapped employees in all City classifications equal to their ratio in the Seattle community.

(Finding of fact No. 7.) Appellants do not contend this finding lacks substantial evidentiary support. Rather they argue it is misleading in failing to make clear that Rule 7.03j requires that reasons be given to justify selective certification and that requests for selective certification must specify a certain race. The finding is an accurate summary of the rule. A trial court is not required to articulate every facet of a rule's operation when making a general finding on its effect.

The trial court also found:

> On August 25, 1972, the Mayor of the City of Seattle issued an executive order establishing an affirmative action program in the City of Seattle and all of its departments to correct a condition of underrepresentation of minorities and females in City employment then existing and recognized as caused by a variety of employment practices in the City which had operated to discriminate against such groups in the past and deny them employment opportunities; said order authorized the use of selective certification to this end.

(Finding of fact No. 8.) Appellants claim this finding is not supported by the evidence and is misleading because it generalizes with respect to all City employment and implies that undesirable conditions existing in other City departments also exist in the Fire Department. We note first that the finding is a correct description of the Mayor's order, which is all it purports to be. We will discuss later the substantial evidence presented at trial to support the existence of a condition of underrepresentation in City employment in general and in the Fire Department in particular at the time the selective certifications challenged here were accomplished.

Appellants further appeal the refusal of the trial court to enter their proposed findings. A trial court is not required to make findings of fact on all matters about which there is evidence in the record. Only those findings

which establish the existence or non–existence of determinative factual matters need be made. *Schoonover v. Carpet World, Inc.*, 91 Wn.2d 173, 588 P.2d 729 (1978); *Bowman v. Webster*, 42 Wn.2d 129, 253 P.2d 934 (1953). It was not error to refuse appellants' proposed findings.

■ Finally, appellants assign error to the trial court's refusal to admit certain offered exhibits. The admission or refusal of evidence lies largely within the sound discretion of the trial court. We will reverse a trial court only upon a showing that it abused that discretion. *Goodell v. ITT–Federal Support Servs., Inc.*, 89 Wn.2d 488, 573 P.2d 1292 (1978). Two of the proffered exhibits were repetitious of earlier testimony and thus properly excluded as superfluous. The other two exhibits violate the hearsay rule and were properly refused.

The remainder of appellants' challenges involve four general issues: (I) does the Affirmative Action Program employed by the City and the Seattle Fire Department violate Title VII of the Civil Rights Act or the equal protection guaranties of the federal and state constitutions?; (II) is there a condition of underrepresentation of minorities in City and Fire Department employment sufficient to support the remedial provisions of the Affirmative Action Program?; (III) if a condition of underrepresentation sufficient to allow racial preference in promotional opportunity exists, can such preference be given to persons who have not suffered individual acts of discrimination?; and (IV) were the procedures used in selectively certifying Claude Harris and Donald Taylor valid?

I

ARE TITLE VII OR EQUAL PROTECTION VIOLATED?

A. TITLE VII

■ The precise question of whether the selective certification procedure employed by Seattle's Affirmative Action Program violates Title VII of the Civil Rights Act was answered by this court in *Lindsay v. Seattle*, 86 Wn.2d 698, 548 P.2d 320 (1976). In *Lindsay* we held that Title VII

permitted affirmative action where necessary to eliminate the continuing effects of past discrimination.

The statistical information presented to the trial court in *Lindsay* indicated the City's prior employee selection procedures had created a substantially disproportionate level of minority representation in public employment over a period of years. This statistical evidence raised an inference that the racial imbalance resulted from discriminatory employment practices. The evidence also indicated the effects of past discrimination tended to perpetuate themselves, *i.e.,* the inequalities resulting from past discrimination made new employment opportunities less accessible to minorities. Recognizing the effect of past discrimination in City hiring we held:

> The fact that the City voluntarily has sought to achieve equality of employment opportunity in the public sphere rather than by court order does not detract from or lessen the legal validity and necessity of its affirmative action program under title 7. Voluntary compliance, rather than court ordered relief, is the congressionally preferred method of achieving equality of employment opportunity.
>
> Selective certification . . . is not only appropriate, but also essential to eradicate in the instant case the present effects of past discrimination.

*Lindsay v. Seattle, supra* at 706.

Appellants contend that our holding in *Lindsay* should not be determinative of their Title VII challenge in light of later United States Supreme Court cases. *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 57 L. Ed. 2d 957, 98 S. Ct. 2943 (1978); *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 52 L. Ed. 2d 396, 97 S. Ct. 1843 (1977). Appellants' position is not well taken.

The cases cited by appellants involve either private or government–initiated actions *against employers* for racially discriminatory hiring practices in violation of Title VII. Although the court reached different results as to the discrimination claims, in each case, it stated in dicta that Title VII did not *require* hiring procedures that maximized the

hiring of minority employees nor did it *require* that the work force mirror the racial makeup of the general population. *Furnco,* 438 U.S. at 577–78; *Teamsters,* 431 U.S. at 340. As we made clear in *Lindsay,* Seattle voluntarily established its affirmative action programs. Thus, while the above cited cases reflect the United States Supreme Court's consideration of precisely what remedial efforts are mandated by Title VII, they do not purport to nor should they be read to limit those voluntary remedial efforts permitted by Title VII. In the absence of a compelling reason to overturn it, we hold *Lindsay* controls as to appellants' Title VII claim and on this issue the trial court is affirmed.

## B. EQUAL PROTECTION

Appellants challenge the City's selective certification procedure as violating the equal protection guaranties of the federal and state constitutions.[1] The equal protection issue was not preserved for appeal in *Lindsay.*

In an equal protection challenge, a necessary initial determination is the proper level of judicial scrutiny applicable to the challenged classification. The task is particularly difficult, where, as here, "reverse discrimination" is charged. Although this issue recently was raised in *Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 57 L. Ed. 2d 750, 98 S. Ct. 2733 (1978), a majority of the court failed to agree on the appropriate constitutional standard of review where affirmative action programs are challenged. Justices Powell and White would hold that racial or ethnic distinctions of any kind are inherently suspect and call for the "most

---

[1]U.S. Const. amend. 14, § 1 reads in pertinent part:

nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Article 1, section 12 of the Washington Constitution states:

No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations.

The state clause is given the same general interpretation as the federal clause. *Hanson v. Hutt,* 83 Wn.2d 195, 517 P.2d 599 (1973); *DeFunis v. Odegaard,* 82 Wn.2d 11, 507 P.2d 1169 (1973).

exacting judicial examination." *Bakke,* 438 U.S. at 291. Justices Brennan, Marshall and Blackmun, dissenting, opined that "racial classifications designed to further remedial purposes '"must serve important governmental objectives and must be substantially related to achievement of those objectives."'" *Bakke,* 438 U.S. at 359.[2] In the instant case it is not necessary to decide which among these standards is the more appropriate since we hold the selective certification procedure survives the constitutional challenge under both standards.

■ In *DeFunis v. Odegaard,* 82 Wn.2d 11, 507 P.2d 1169 (1973), the admissions program of the University of Washington Law School was unsuccessfully challenged as violative of equal protection. We held therein that the "burden is upon the law school to show that its consideration of race in admitting students is necessary to the accomplishment of a compelling state interest." *DeFunis,* 82 Wn.2d at 32. We recently applied the same standard in *McDonald v. Hogness,* 92 Wn.2d 431, 598 P.2d 707 (1979), to uphold the admissions program of the University of Washington medical school against a similar equal protection challenge. The vitality of the standard enunciated in *DeFunis* has not been diminished by *Bakke.* Here, too, the City has the burden of demonstrating that the selective certification procedures used by the City and its departments are necessary to the accomplishment of a compelling governmental interest.

The trial court found:

In 1964, minorities were grossly underrepresented in employment within the Seattle Fire Department in relation to their composition within the available City work force. In 1972, 1974 and 1976 they continued to be substantially underrepresented within that department in relation to the minority work force in the City. Minorities are also underrepresented in job classes after entry. In 1976 there were still no minorities employed in the 30

---

[2]The remaining members of the Court did not reach the equal protection issue instead invalidating the University's admission standards as violative of Title VI.

official and administerial positions within the Fire Department and only 8 employed as Fire Captains or Fire Lieutenants out of a total of 155 such positions. (Finding of fact No. 15.) The trial court further found that the City's past employee selection processes had discriminated against minority applicants, the effects of which were continuing and that such discrimination affected hiring and promotion of uniformed personnel within the Seattle Fire Department. (Finding of fact No. 16.)

Our review of the record indicates that these findings are thoroughly supported by fact. In 1965, 7 percent of the City's employees were minorities[3] while minorities represented only 0.3 percent of the Seattle Fire Department personnel.[4] There is no evidence in the record as to the percentage of minorities in the available work force at that time. In 1970 minorities represented 8.1 percent of the City's employees and 3.2 percent of the Fire Department's employees.[5] In that year, minorities represented 13.5 percent of the available work force.[6] By 1975, 15.2 percent of City employees and 8.6 percent of Fire Department employees were minorities.[7] Minorities represented 15.8 percent of the available work force in that year.[8] These figures provide graphic factual support for the trial court's

---

[3]Minority as used in the statistics included all non–caucasian races. Caucasian females were not included as a minority group in the calculations.

[4]Minority Employment Charts, 1965–1969, Seattle Human Rights Department Compilation, Exhibit 44.

[5]Minority Employment Charts, 1970, Seattle Human Rights Department Compilation, Exhibit 44.

[6]Puget Sound Prospectus No. 3, Affirmative Action, Chamber of Commerce, Exhibit 44.

[7]Race and Sex Summaries by Category and Department in City Employment, 1972–76, Exhibit 44.

[8]Washington State Employment Security Department, Labor Market Analysis, Suppl. to Manpower Information for Affirmative Action Programs, 1974–75, Exhibit 44.

finding of underrepresentation in both City and Fire Department employment. However, more telling are those statistics that reveal the underrepresentation of minorities in particular job classifications.[9] These latter figures render less meaningful the overall appearance of minority employment in the City and the Department. In City employment as a whole and particularly in the Seattle Fire Department, minorities are substantially underrepresented in supervisory and administrative classifications.

In light of the underrepresentation of minorities in the Seattle Fire Department as well as in City employment as a whole, and particularly considering the substantial underrepresentation in upper–level positions, we find the City's interest in employing selective certification to eliminate the racial imbalance in its employment to be compelling.[10] The

---

[9] Race Summary by Job Category—% of Minority.

| | | Officials & Managers | Professionals Supervisors/ Analysts | Technicians (Training) | Office & Clerical (Secretaries & Clerks) | Protective Services (Capt., Lt., Firemen) | Craftsman | Paraprofessionals (Aides) |
|---|---|---|---|---|---|---|---|---|
| 1972 | City | 6.9 | 13.4 | 15.0 | 12.8 | 10.7 | 7.0 | — |
| | SFD | --0– | –0– | –0– | 10.0 | 6.3 | 8.0 | 100 |
| 1973 | City | 8.1 | 13.2 | 24.8 | 14.0 | 7.2 | 8.9 | 29.8 |
| | SFD | –0– | –0– | –0– | 5.6 | 7.6 | –0– | 50 |
| 1974 | City | 8.2 | 13.1 | 13.5 | 13.8 | 7.4 | 9.8 | 16.3 |
| | SFD | –0– | –0– | –0– | 5.2 | 8.0 | –0– | –0– |
| 1975 | City | 7.8 | 14.9 | 14.9 | 15.6 · | 14.2 | 10.5 | 25.9 |
| | SFD | –0– | –0– | –0– | 15.0 | 8.8 | –0– | –0– |
| 1976 | City | 7.4 | 16.0 | 15.6 | 17.5 | 8.8 | 11.7 | 27.5 |
| | SFD | –0– | –0– | –0– | 18.2 | 9.6 | –0– | –0– |

Source: Computer Printout of Seattle Race & Sex Summaries by Categories & Departments—1972–1976 Composite of Exhibits 45 and 46.

[10] In his opinion in *Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 57 L. Ed. 2d 750, 98 S. Ct. 2733 (1978), Justice Powell suggests that a government interest in remedying the effects of past discrimination cannot be a compelling justification for an affirmative action program absent "judicial, legislative or administrative findings of constitutional or statutory violations." *Bakke,* 438 U.S. at 307. While recognizing that a majority of the court did not join in this suggestion, we note that the Equal Employment Opportunity Commission formally charged the City of Seattle with violating Title VII in 1973. In addition, both the trial court and this court found the City in violation of Title VII in *Lindsay v. Seattle,* 86 Wn.2d 698, 548 P.2d 320 (1976).

fact that minorities participate on an equal basis in the tax support of the City further supports this conclusion. *DeFunis v. Odegaard, supra* at 33.

We hold that the selective certification procedure violates neither the equal protection clause of the fourteenth amendment to the United States Constitution nor article 1, section 12 of the Washington State Constitution. We affirm the trial court on this issue.

## II
### CONDITION OF UNDERREPRESENTATION

Having determined that selective certification is both constitutionally and statutorily valid, we now turn to the remaining issues raised by appellants. We made clear in *Lindsay* that the "basis and rationale for affirmative relief will disappear when the vestiges of past discriminatory effects *substantially are eliminated.*" *Lindsay v. Seattle, supra* at 707. Appellants suggest a number of reasons why the trial court erred in holding that the effects of past discrimination have not been substantially eliminated.

Appellants first contend there has not been a pattern or practice of racial discrimination in the hiring and promotion policies of the Fire Department, whatever the effect of City hiring policies on City employment, as a whole, may have been. The trial court found:

> The City of Seattle's employee selection processes in the past have discriminated against minority applicants, the effects of which are continuing. That discrimination affected hiring and promotion of uniformed personnel within the Seattle Fire Department.

(Finding of fact No. 16.) Appellants claim this finding is not supported by substantial evidence. However, statistical evidence in the record, some of which is set forth above and in footnote 9, establishes that minorities have been substantially underrepresented in the Fire Department and that this underrepresentation is particularly evident at the supervisory level. There is substantial evidentiary support for the trial court's finding.

Appellants' next contention involves the statistical base employed by the City, and by the trial court, to determine that a racial imbalance existed in the work force of the City and Fire Department. The issue can be summarized as follows: in compiling statistics to determine whether racial imbalance exists in employment, should the relevant geographic area be determined by the entire greater metropolitan area from which the Seattle Fire Department's labor force is drawn or resides, or should it be determined by the population residing within the geographical area wherein the City's work is performed and over which it has territorial jurisdiction?

In designing and evaluating its Affirmative Action Program the City used the geographic boundaries of Seattle to define the relevant labor market. The trial court found use of this labor market to evaluate the racial composition of the City's work force was reasonably and rationally related to the City's function and territorial jurisdiction. (Finding of fact No. 25.) Appellants assigned error to this finding contending that a more appropriate labor market would have been that area from which the Fire Department's employees are drawn as evidenced by their current places of residence. According to them, the relevant area should be the entire Seattle–Everett Standard Metropolitan Statistical Area.

Statistics can provide evidentiary support for an allegation of a pattern or practice of discrimination under Title VII. *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 52 L. Ed. 2d 396, 97 S. Ct. 1843 (1977). In fact, where gross statistical disparities can be shown, they alone, in a proper case, may constitute prima facie proof of discrimination. *Hazelwood School Dist. v. United States,* 433 U.S. 299, 53 L. Ed. 2d 768, 97 S. Ct. 2736 (1977). Where, as here, a demographic statistical method is used, a pattern of discrimination may be inferred from the statistical disparity between the work force and the general public. However, the validity of such an inference depends upon whether the geographic area coincides

with the relevant labor market in a particular case. Therefore, a determination of whether minority group members are proportionately represented in an employer's work force initially requires an identification of the appropriate population to be used as a base.

As important as this determination is, courts have yet to express workable guidelines for the selection of the appropriate population from which the statistics are to be derived. Several courts have assumed the relevant labor market is either the city from which an employer draws its workers or the city within which it does business. *Castro v. Beecher,* 459 F.2d 725 (1st Cir. 1972); *United States v. Hayes Int'l Corp.,* 456 F.2d 112 (5th Cir. 1972); *Carter v. Gallagher,* 452 F.2d 315 (8th Cir. 1971); *United States v. Ironworkers Local 86,* 443 F.2d 544 (9th Cir.), *cert. denied,* 404 U.S. 984 (1971). Another court has held that in comparing the percentage of minorities in a labor pool with the percentage in a union, the appropriate geographic area to be used is the area from which the union draws its members rather than the area encompassed by the union work jurisdiction. *Equal Employment Opportunity Comm'n v. Local 14, Int'l Union of Operating Eng'rs,* 553 F.2d 251 (2d Cir. 1977). The United States Supreme Court also has suggested that, in certain cases, the appropriate labor market for comparison would be that area from which the specifically educated and trained labor was drawn. *Hazelwood School Dist. v. United States, supra.* However, the court did not designate the labor market or area it considered relevant. That was left to the trial court for later determination. At best the combined effect of these cases appears to require that the focus be relevant to the issue at hand whether it involves employment tests, physical requirements, the prior training or education of employees being hired and compared, or the areas being compared.

In the instant case it is not necessary to decide which of the above approaches is correct. Although appellants contend that in considering the geographical area of the labor pool, the Seattle Fire Department, rather than the City of

Seattle, should be the statistical focus, we do not agree. Based upon both law and logic, we hold the *City,* not the Fire Department, is the appropriate focus. An unchallenged finding of the trial court establishes that the City is the actual employer of the appellants. Title VII, Executive Order 11246 and Labor Department Revised Order 4, and RCW 49.60 place a duty on the City to end discriminatory hiring practices. The Fire Department is not an independent entity separate from the City of Seattle—rather it is a creature of that municipality. *See* Charter of the City of Seattle, article 3, section 1. The record reveals that the geographic limits of the City are used by the Seattle Human Rights Department as the comparative market for all the affirmative action plans for Seattle and that all City departments are subject to the same analysis. This area was chosen on the basis of a number of factors including transportation, housing, police protection and residence requirements. It would be unrealistic to require the City to calculate an appropriate labor area for each of its departments based upon the changing residences of the employees within a department. The record establishes that the majority of the City's employees reside in Seattle and the City draws most of its work force from Seattle. Therefore, the labor market used by the City to establish its base for the consideration of minority hiring (*i.e.,* that area encompassed by Seattle city limits) was reasonable. It is also of interest to note that even if we were to adopt appellants' broader concept of "relevant work force" the statistics at hand still demonstrate that minority employees are substantially underrepresented *in upper level positions* within the Seattle Fire Department. In the final analysis these are the positions with which we are primarily concerned in this case. We affirm the trial court on this issue.

Appellants finally contend any statistical evidence of racial discrimination is rebutted by showing that examination and selection procedures for promotion are based on Civil Service Merit Examinations which have been "validated" as that term is used by the Equal Employment

Opportunity Commission (EEOC). This, however, presents only a minor part of the picture. The examinations in question were not fully validated. Rather they were only "content" validated by the EEOC subsequent to 1971. It is stipulated that prior to that time *none* of the civil service examinations had been validated in any way. Further, the trial court found, and there is substantial evidentiary support that:

> Civil Service examinations including Fire Department related exams continue to adversely impact minority candidates for appointment, inasmuch as such candidates continue to have a greater failure rate and place on the lower ends of the registers when they pass. Although the City now employs the "content" validation method on its tests, it appears such validation is often inadequate or suspect, is capable of bias, has been challenged by the Equal Employment Opportunity Commission and is sought to be improved by the City to the end of making these tests truly job related and color blind.

(Finding of fact No. 17.)

The requirements for test validation are set forth in EEOC guidelines and are now firmly established in the law of employment testing. 29 C.F.R. 1607.4–.9; *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 45 L. Ed. 2d 280, 95 S. Ct. 2362 (1975). "Validation" is a term of art for the process of determining the "job relatedness" of a selection procedure. There are three methods of validating employment tests: "content" validation which was employed here, "construct" validation, and "criterion" validation.[11] Criterion differs from "content" and "construct" validation in

---

[11] "Content" validity is established if the content of the test closely duplicates the actual duties to be performed by the applicant. "Construct" validation requires identification of general mental and psychological traits believed necessary to successful job performance and fashioning a qualifying examination to test for the presence of those traits. "Criterion" validation (also known as predictive validation) involves identifying criteria that indicate successful job performance and matching test scores with successful job performance ratings for the criteria to determine whether the applicant who receives high scores performs as predicted. *Washington v. Davis,* 426 U.S. 229, 247 n.13, 48 L. Ed. 2d 597, 96 S. Ct. 2040 (1975).

that the former examines not only the content of the test but the relationship between test success and job performance. The EEOC considers "criterion" validation the most accurate and courts have recognized it as the best method of establishing job–relatedness. EEOC Decision No. 73–0499 (1973); *Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Serv. Comm'n,* 482 F.2d 1333 (2d Cir. 1973); *Boston Chapter, NAACP, Inc. v. Beecher,* 504 F.2d 1017 (1st Cir. 1974), *cert. denied,* 421 U.S. 910 (1975). In fact, the EEOC allows "content" and "construct" validation only when "criterion" validation is not feasible. 29 C.F.R. 1607.5. The trial court's critical characterization of the "content" validation is accurate.

Employment selection and promotion procedures are subject to scrutiny under Title VII if they result in substantially higher failure rates among protected applicants. A prima facie violation can be established by showing such a disproportionate impact on a protected class. *Dothard v. Rawlinson,* 433 U.S. 321, 53 L. Ed. 2d 786, 97 S. Ct. 2720 (1977); *Davis v. County of Los Angeles,* 566 F.2d 1334 (9th Cir. 1977). The burden then shifts to the employer to demonstrate that the test is a valid predictor of job performance. *Griggs v. Duke Power Co.,* 401 U.S. 424, 28 L. Ed. 2d 158, 91 S. Ct. 849 (1971); *Davis v. County of Los Angeles, supra.* Nevertheless, appellants appear to contend that once a test has been "content" validated there can be no evidence of racial discrimination. The EEOC in its guidelines for employee selection and promotion does not suggest that the validation of tests alone negates the possibility of discriminatory practices.

Nothing in these guidelines shall be interpreted as diminishing a person's obligation under both title VII and Executive Order 11246 as amended by Executive Order 11375 to undertake affirmative action to ensure that applicants or employees are treated without regard to race, color, religion, sex, or national origin. *Specifically, the use of tests which have been validated . . . does not relieve employers . . . of their obligations to*

*take positive action in affording employment and training to members of classes protected by title VII.*

(Italics ours.) 29 C.F.R. § 1607.14 (1978). Fully consistent with the foregoing EEOC guidelines, the trial court did not absolve the City of its duty merely because the tests had been "content" validated.

The trial court was quite correct in avoiding a suggestion that the tests administered by the commission, whether or not adequately validated, were solely responsible for the Department's condition of minority underrepresentation. Rather, it found and the record clearly supports the fact that racial imbalance within the Fire Department may have resulted from a variety of selection procedures only one of which was testing.

> Other employment practices within the City continue to operate to the disadvantage of minority candidates for promotional opportunities within the Seattle Fire Department and tend to freeze the status quo, in particular the requirement for long years of service at lower grades to be eligible for promotional exams and the addition of service credits to certain candidate's tests scores relating to the number of years those candidates have been employed by the City.

(Finding of fact No. 18.) Prospective employees of the Fire Department, in addition to passing the civil service examination, must pass a background and medical check, meet certain educational requirements and successfully complete recruit school. Testimony indicated that minorities traditionally have not fared as well as Caucasians in these areas. In the Department's promotional procedures, in–service credits clearly improved the competitive positions of candidates for promotion.[12] Because of the substantial underrepresentation of minorities in the past, these credits

---

[12]Regularly appointed employees who receive a passing grade on a promotional examination have in–service credits added to their grade. Credit is given for a maximum of 20 years' extra service with a maximum of 10 points computed in the following manner.

(1) 1 point for each full year for the first 4 years of service in excess of the minimum service specified for entrance to the examination;

negatively impact on the relative positions of minorities competing for promotional opportunities.

The trial court found that article 16, section 9 of the Seattle City Charter, which defines the regular certification procedures, has the effect of impeding and frustrating the employment opportunities of minorities within the Fire Department. (Finding of fact No. 20.) Appellants suggest this finding is contrary to the evidence because the trial court had facts before it indicating minorities were achieving *passing rates* on the promotional examinations roughly equal to the rate of non–minorities. Actually there is conflicting evidence on this point. Where the trial judge is presented with conflicting evidence, we will not disturb his finding based upon that evidence. *Jacobs v. Brock,* 73 Wn.2d 234, 437 P.2d 920 (1968); *King Logging Co. v. Scalzo,* 16 Wn. App. 918, 561 P.2d 206 (1977). Moreover, the appropriate focus under article 16, section 9 is not the passage rate but the top quartile or top five persons among those who successfully pass the examination. The record supports the trial court's finding as it relates to minority placement in the top 25 percent of eligible candidates. The trial court is affirmed on this issue.

## III
### ACTUAL VICTIMIZATION
The trial court held:

> The persons benefitted by affirmative action of the City to integrate its work force need not prove they themselves have been discriminated against in the employment process.

Conclusion of law No. 11. Appellants assign error to this holding, claiming the selective certification here employed was invalid because neither Harris nor Taylor were shown to have suffered any act of individual discrimination. They contend that a determination of actual victimization is a prerequisite for the use of a racial preference in the form of

---

(2) 1/2 point for each full year of the next 8 years of service;

(3) 1/4 point for each additional full year of service.

selective certification. As primary support for this contention appellants cite *Weber v. Kaiser Alum. & Chem. Corp.,* 563 F.2d 216 (5th Cir. 1977). Subsequent to oral argument in the instant case, the United States Supreme Court reversed the decision of the Circuit Court thereby considerably weakening appellant's contention. *United Steelworkers of America v. Weber,* 443 U.S. 193, 61 L. Ed. 2d 480, 99 S. Ct. 2721 (1979).

*Weber* arose from a collective bargaining agreement covering terms and conditions of employment at numerous Kaiser Aluminum plants. The agreement included an affirmative action plan under which Kaiser and the United Steelworkers union were to admit minorities into on-the-job training programs on a one-to-one ratio with whites until the percentage of minority craft workers roughly approximated the percentage of minorities in the relevant labor force. To accomplish such minority representation, seniority lists for both whites and minorities were established and admission to the program was made on a one-to-one ratio from the separate lists. As a result, minority employees were admitted to the training programs ahead of white employees with greater seniority.

Weber, a white employee at one of the plants, brought a class action under Title VII challenging the dual seniority system. The District Court found the system constituted unlawful reverse discrimination and enjoined the use of quotas at that plant. On appeal, the Fifth Circuit affirmed and held that Title VII permits the use of racial quotas only as a make-whole remedy for victims of the employers' past discrimination. *Weber v. Kaiser Alum. & Chem. Corp., supra* at 226.

In reversing, the Supreme Court identified the only question presented by *Weber* as:

> the narrow statutory issue of whether Title VII *forbids* private employers and unions from voluntarily agreeing upon bona fide affirmative action plans that accord racial preferences in the manner and for the purpose provided in the [challenged] plan.

*United Steelworkers of America v. Weber, supra* at 200. The court held Title VII did not prohibit all private, voluntary, race–conscious affirmative action plans, including the plan there challenged. Throughout the opinion, the court emphasized the private and voluntary character of the Kaiser plan.

 While the affirmative action program employed by the City of Seattle is voluntary, it was created by and continues to be administered by a public rather than a private employer and thus the holding in *Weber* is of limited use in our evaluation of the instant program. However, certain differences between the plan at issue in *Weber* and that challenged here highlight the basis for our holding that actual victimization is not a prerequisite to selective certification of a particular employee even when accomplished by a public employer.

Unlike the affirmative action program in *Weber*, the program challenged here does not involve a quota. As we mentioned above, the purpose of selective certification is to create an alternative procedure to that established by Article 16 of the City Charter. This selective procedure simply allows eligible minorities, *not within the top ranks of the eligibility register*, to be *considered* for advancement. The use of selective certification neither guarantees the promotion of any particular individual nor absolutely assures that a certain numerical goal of minority representation will be reached. This clearly is not a quota.[13]

---

[13]In *Lindsay v. Seattle*, 86 Wn.2d 698, 548 P.2d 320 (1976) this court referred to the affirmative action policies of Seattle's Department of Engineering as involving temporary quotas. However, the Engineering Department, at the time of the challenged appointment, employed an affirmative action program that involved not only selective certification but also a policy of filling the first of every three vacancies "with appropriate minorities." *Lindsay*, 86 Wn.2d at 711. This court correctly characterized that *combined* system as a temporary quota although we were careful to note that the case did not involve an absolute quota. *Lindsay*, 86 Wn.2d at 711. It was the policy of filling one out of every three vacancies with a minority employee and not the selective certification procedure which caused the affirmative action program challenged in *Lindsay* to be characterized as a temporary quota, however.

504

In finding Kaiser's affirmative action plan a permissible racial preference, the *Weber* court emphasized that the plan did not "unnecessarily trammel" the interests of white employees, require the discharge of white workers, or create an absolute bar to the advancement of white employees. *United Steelworkers of America v. Weber, supra* at 208. The same is true of Seattle's selective certification procedures. Whether or not a selective certification is requested, the top five persons on the eligibility register or the top 25 percent of the register are certified under regular procedures. A request for selective certification therefore does not cause anyone otherwise eligible to lose their eligibility and appellants do not so contend. Selective certification simply increases the number of candidates, it does not replace non–minority candidates with minority candidates and appellants do not claim otherwise. The selection from among the total number of candidates is ultimately a discretionary decision of the department head. Therefore, while appellants here had a reasonable expectation of being certified, that expectation was not affected by the presence of selectively certified candidates. While appellants had a reasonable expectation of being certified, they cannot be said to have had a justified expectation of receiving an actual appointment to the position for which they were certified. Thus, the use of selective certification does not cause existing employees to be displaced, call for the hiring or promotion of unqualified persons, or create an absolute preference for minorities to the exclusion of non–minorities.

Under the circumstances of this case and in light of the proof of past and continuing discriminatory practices by both the City and the Fire Department, we hold that proof

We are not prepared at this time to determine if the system employed in *Lindsay,* whether denominated as a goal, preference or temporary quota, would be valid or invalid in light of subsequent federal decisions. Whether an affirmative action program like that in *Lindsay,* imposing a temporary quota to correct past discrimination and *also* designed to attain racial balance of the work force, would be valid was not considered in *Lindsay.* Further, that issue is not before us in the instant case. The resolution of that issue must await another day.

of actual personal victimization of a minority employee is not a prerequisite to the application of affirmative relief in the form of selective certification.[14] It is sufficient that those benefitted by selective certification are within a class of persons identified by Rule 7.03j as likely to have been the victims of discrimination. Our holding is consistent with a number of cases declining to require proof of specific acts of discrimination against each beneficiary of affirmative action. *Davis v. County of Los Angeles,* 566 F.2d 1334 (9th Cir. 1977); *Equal Employment Opportunity Comm'n v. American Tel. & Tel. Co.,* 556 F.2d 167 (3d Cir. 1977); *Barnett v. W.T. Grant Co.,* 518 F.2d 543 (4th Cir. 1975); *Carter v. Gallagher,* 452 F.2d 315 (8th Cir. 1971).

The trial court is affirmed on this issue.

---

[14]We note with considerable interest the extent to which the United States Supreme Court was willing to go to permit the use of prior discrimination and thus avoid the need to prove actual personal victimization of a member of a minority race. *See United Steelworkers of America v. Weber,* 443 U.S. 193, 198 n.1, 61 L. Ed. 2d 480, 99 S. Ct. 2721 (1979):

> Judicial findings of exclusion from crafts on racial grounds are so numerous as to make such exclusion a proper subject for judicial notice. See, *e.g., United States v. International Union of Elevator Constructors,* 538 F. 2d 1012 (CA3 1976); *Associated General Contractors of Massachusetts v. Altshuler,* 490 F. 2d 9 (CA1 1973); *Southern Illinois Builders Association v. Ogilve,* 471 F. 2d 680 (CA7 1972); *Contractors Association of Eastern Pennsylvania v. Secretary of Labor,* 442 F. 2d 159 (CA3 1971); *Local 53 of International Association of Heat & Frost, etc. v. Vogler,* 407 F. 2d 1047 (CA5 1969); *Buckner v. Goodyear,* 339 F. Supp. 1108 (ND Ala. 1972), aff'd without opinion, 476 F. 2d 1287 (CA5 1973). See also United States Commission on Civil Rights, The Challenge Ahead: Equal Opportunity in Referral Unions 58–94 (1976), (summarizing judicial findings of discrimination by craft unions); G. Myrdal, An American Dilemma (1944) 1079–1124; R. Marshall and V. Briggs, The Negro and Apprenticeship (1967); S. Spero and A. Harris, The Black Worker (1931); United States Commission on Civil Rights, Employment 97 (1961), State Advisory Committee, United States Commission on Civil Rights, 50 States Report 209 (1961); Marshall, "The Negro in Southern Unions," in The Negro and the American Labor Movement (ed. Jacobson, Anchor 1968) p. 145; App., 63, 104.

Whether we would be willing to extend "judicial notice" to such an extent need not be answered at this time. The question of prior discrimination has been established by actual proof.

## IV
### SELECTIVE CERTIFICATION USE VALID

Finally, appellants challenge the individual certifications of Harris and Taylor. It is contended the procedures employed in certifying them for their respective positions did not meet the requirements of Rule 7.03j.

Appellants claim the appointment of Harris was ineffective because the Fire Chief did not initially request selective certification to fill the available Fire Battalion Chief positions. The trial court concluded that the Chief's ultimate appointment of Harris was effective and cured any claimed defect in the certification. (Conclusion of law No. 10.) We agree. The record indicates the Fire Chief knew he had discretion to appoint from among all persons certified for the Battalion Chief position. The mere fact that one of the candidates had been selectively certified did not limit that discretion. Knowing that, he exercised his discretion by appointing Harris and two other candidates thereby ratifying the selective certification. *National Bank of Commerce v. Thomsen,* 80 Wn.2d 406, 495 P.2d 332 (1972). Therefore, although the procedure used did not specifically follow that defined in Rule 7.03j, the Chief's subsequent appointment of Harris to the position of Fire Battalion Chief cured the earlier procedural defect.

Appellants similarly challenge the selective certification of Taylor for failing to specify reasons for the request, as required by Rule 7.03j. Contrary to appellants' contention, the selective certification request filed by the Fire Chief for the position of Fire Lieutenant indicates both that selective certification was needed to achieve adequate representation of minorities and that only 7 out of 120 Fire Lieutenants at that time were minorities. The request met the requirements of Rule 7.03j. The appointments of Harris and Taylor were valid.

The trial court is affirmed.

UTTER, C.J., and WRIGHT, BRACHTENBACH, HOROWITZ, DOLLIVER, HICKS, and WILLIAMS, JJ., concur.

ROSELLINI, J. (concurring)—I concur in the opinion solely on the basis of the authority of *Lindsay v. Seattle,* 86 Wn.2d 698, 548 P.2d 320 (1976).

Reconsideration denied October 8, 1979.